CRUZAN, BY HER PARENTS AND CO-GUARDIANS, CRUZAN
ET UX. *v.* DIRECTOR, MISSOURI DEPARTMENT
OF HEALTH, ET AL.

No. 88–1503.   Argued December 6, 1989—Decided June 25, 1990

262

REHNQUIST, C. J., delivered the opinion of the Court, in which WHITE, O'CONNOR, SCALIA, and KENNEDY, JJ., joined. O'CONNOR, J., *post*, p. 287, and SCALIA, J., *post*, p. 292, filed concurring opinions. BRENNAN, J., filed a dissenting opinion, in which MARSHALL and BLACKMUN,

JJ., joined, *post*, p. 301. STEVENS, J., filed a dissenting opinion, *post*, p. 330.

*William H. Colby* argued the cause for petitioners. With him on the briefs were *David J. Waxse, Walter E. Williams, Edward J. Kelly III, John A. Powell,* and *Steven R. Shapiro.*

*Robert L. Presson,* Assistant Attorney General of Missouri, argued the cause for respondent Director, Missouri Department of Health, et al. With him on the brief were *William L. Webster,* Attorney General, and *Robert Northcutt.*

*Thad C. McCanse, pro se,* and *David B. Mouton* filed a brief for respondent guardian ad litem.

*Solicitor General Starr* argued the cause for the United States as *amicus curiae* urging affirmance. With him on the brief were *Acting Assistant Attorney General Schiffer, Deputy Solicitor General Merrill,* and *Brian J. Martin.* *

---

*Briefs of *amici curiae* urging reversal were filed for the AIDS Civil Rights Project by *Walter R. Allan;* for the American Academy of Neurology by *John H. Pickering;* for the American College of Physicians by *Nancy J. Bregstein;* for the American Geriatrics Society by *Keith R. Anderson;* for the American Hospital Association by *Paul W. Armstrong;* for the American Medical Association et al. by *Rex E. Lee, Carter G. Phillips, Elizabeth H. Esty, Jack R. Bierig, Russell M. Pelton, Paul G. Gebhard, Laurie R. Rockett,* and *Henry Hart;* for the Colorado Medical Society et al. by *Garth C. Grissom;* for Concern for Dying by *Henry Putzel III* and *George J. Annas;* for the Evangelical Lutheran Church in America by *Susan D. Reece Martyn* and *Henry J. Bourguignon;* for the General Board of Church and Society of the United Methodist Church by *Thomas S. Martin* and *Magda Lopez;* for Missouri Hospitals et al. by *Mark A. Thornhill, E. J. Holland, Jr.,* and *John C. Shepherd;* for the National Hospice Organization by *Barbara F. Mishkin* and *Walter A. Smith, Jr.;* for the National Academy of Elder Law Attorneys by *Robert K. Huffman;* for the Society of Critical Care Medicine et al. by *Stephan E. Lawton;* for the Society for the Right to Die, Inc., by *Fenella Rouse;* for Wisconsin Bioethicists et al. by *Robyn S. Shapiro, Charles H. Barr,* and *Jay A. Gold;* for Barbara Burgoon et al. by *Vicki Gottlich, Leslie Blair Fried,* and *Stephanie M. Edelstein;* and for John E. McConnell et al. by *Stephen A. Wise.*

Briefs of *amici curiae* urging affirmance were filed for Agudath Israel of America by *David Zwiebel;* for the American Academy of Medical Ethics by *James Bopp, Jr.;* for the Association of American Physicians and Sur-

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

Petitioner Nancy Beth Cruzan was rendered incompetent as a result of severe injuries sustained during an automobile accident. Copetitioners Lester and Joyce Cruzan, Nancy's parents and coguardians, sought a court order directing the withdrawal of their daughter's artificial feeding and hydration equipment after it became apparent that she had virtually no chance of recovering her cognitive faculties. The Supreme Court of Missouri held that because there was no clear and convincing evidence of Nancy's desire to have life-sustaining treatment withdrawn under such circumstances, her parents lacked authority to effectuate such a request. We granted certiorari, 492 U. S. 917 (1989), and now affirm.

geons et al. by *Edward R. Grant* and *Kent Masterson Brown;* for the Association for Retarded Citizens of the United States et al. by *James Bopp, Jr., Thomas J. Marzen,* and *Stanley S. Herr;* for the Catholic Lawyers Guild of the Archdiocese of Boston, Inc., by *Calum B. Anderson* and *Leonard F. Zandrow, Jr.;* for the District Attorney of Milwaukee County, Wisconsin, by *E. Michael McCann, pro se,* and *John M. Stoiber;* for Doctors for Life et al. by *David O. Danis* and *Gerard F. Hempstead;* for Families for Life et al. by *Robert L. Mauro;* for Focus on the Family et al. by *Clarke D. Forsythe, Paul Benjamin Linton,* and *H. Robert Showers;* for Free Speech Advocates et al. by *Thomas Patrick Monaghan* and *Jay Alan Sekulow;* for the International Anti-Euthanasia Task Force et al. by *Jordan Lorence;* for the Knights of Columbus by *James H. Burnley IV, Robert J. Cynkar,* and *Carl A. Anderson;* for the National Right to Life Committee, Inc., by *James Bopp, Jr.;* for the New Jersey Right to Life Committee, Inc., et al. by *Donald D. Campbell* and *Anne M. Perone;* for the Rutherford Institute et al. by *John W. Whitehead, James J. Knicely, David E. Morris, William B. Hollberg, Amy Dougherty, Thomas W. Strahan, William Bonner, John F. Southworth, Jr.,* and *W. Charles Bundren;* for the United States Catholic Conference by *Mark E. Chopko* and *Phillip H. Harris;* for the Value of Life Committee, Inc., by *Walter M. Weber;* and for Elizabeth Sadowski et al. by *Robert L. Mauro.*

Briefs of *amici curiae* were filed for the American Nurses Association et al. by *Diane Trace Warlick;* and for the SSM Health Care System et al. by *J. Jerome Mansmann* and *Melanie DiPietro.*

On the night of January 11, 1983, Nancy Cruzan lost control of her car as she traveled down Elm Road in Jasper County, Missouri. The vehicle overturned, and Cruzan was discovered lying face down in a ditch without detectable respiratory or cardiac function. Paramedics were able to restore her breathing and heartbeat at the accident site, and she was transported to a hospital in an unconscious state. An attending neurosurgeon diagnosed her as having sustained probable cerebral contusions compounded by significant anoxia (lack of oxygen). The Missouri trial court in this case found that permanent brain damage generally results after 6 minutes in an anoxic state; it was estimated that Cruzan was deprived of oxygen from 12 to 14 minutes. She remained in a coma for approximately three weeks and then progressed to an unconscious state in which she was able to orally ingest some nutrition. In order to ease feeding and further the recovery, surgeons implanted a gastrostomy feeding and hydration tube in Cruzan with the consent of her then husband. Subsequent rehabilitative efforts proved unavailing. She now lies in a Missouri state hospital in what is commonly referred to as a persistent vegetative state: generally, a condition in which a person exhibits motor reflexes but evinces no indications of significant cognitive function.[1] The State of Missouri is bearing the cost of her care.

[1] The State Supreme Court, adopting much of the trial court's findings, described Nancy Cruzan's medical condition as follows:

". . . (1) [H]er respiration and circulation are not artificially maintained and are within the normal limits of a thirty-year-old female; (2) she is oblivious to her environment except for reflexive responses to sound and perhaps painful stimuli; (3) she suffered anoxia of the brain resulting in a massive enlargement of the ventricles filling with cerebrospinal fluid in the area where the brain has degenerated and [her] cerebral cortical atrophy is irreversible, permanent, progressive and ongoing; (4) her highest cognitive brain function is exhibited by her grimacing perhaps in recognition of ordinarily painful stimuli, indicating the experience of pain and apparent response to sound; (5) she is a spastic quadriplegic; (6) her four extremities are contracted with irreversible muscular and tendon damage to all ex-

After it had become apparent that Nancy Cruzan had virtually no chance of regaining her mental faculties, her parents asked hospital employees to terminate the artificial nutrition and hydration procedures. All agree that such a

tremities; (7) she has no cognitive or reflexive ability to swallow food or water to maintain her daily essential needs and . . . she will never recover her ability to swallow sufficient [sic] to satisfy her needs. In sum, Nancy is diagnosed as in a persistent vegetative state. She is not dead. She is not terminally ill. Medical experts testified that she could live another thirty years." *Cruzan* v. *Harmon*, 760 S. W. 2d 408, 411 (Mo. 1989) (en banc) (quotations omitted; footnote omitted).

In observing that Cruzan was not dead, the court referred to the following Missouri statute:

"For all legal purposes, the occurrence of human death shall be determined in accordance with the usual and customary standards of medical practice, provided that death shall not be determined to have occurred unless the following minimal conditions have been met:

"(1) When respiration and circulation are not artificially maintained, there is an irreversible cessation of spontaneous respiration and circulation; or

"(2) When respiration and circulation are artificially maintained, and there is total and irreversible cessation of all brain function, including the brain stem and that such determination is made by a licensed physician." Mo. Rev. Stat. § 194.005 (1986).

Since Cruzan's respiration and circulation were not being artificially maintained, she obviously fit within the first proviso of the statute.

Dr. Fred Plum, the creator of the term "persistent vegetative state" and a renowned expert on the subject, has described the "vegetative state" in the following terms:

" 'Vegetative state describes a body which is functioning entirely in terms of its internal controls. It maintains temperature. It maintains heart beat and pulmonary ventilation. It maintains digestive activity. It maintains reflex activity of muscles and nerves for low level conditioned responses. But there is no behavioral evidence of either self-awareness or awareness of the surroundings in a learned manner.'" *In re Jobes*, 108 N. J. 394, 403, 529 A. 2d 434, 438 (1987).

See also Brief for American Medical Association et al. as *Amici Curiae* 6 ("The persistent vegetative state can best be understood as one of the conditions in which patients have suffered a loss of consciousness").

removal would cause her death. The employees refused to honor the request without court approval. The parents then sought and received authorization from the state trial court for termination. The court found that a person in Nancy's condition had a fundamental right under the State and Federal Constitutions to refuse or direct the withdrawal of "death prolonging procedures." App. to Pet. for Cert. A99. The court also found that Nancy's "expressed thoughts at age twenty-five in somewhat serious conversation with a housemate friend that if sick or injured she would not wish to continue her life unless she could live at least halfway normally suggests that given her present condition she would not wish to continue on with her nutrition and hydration." *Id.*, at A97–A98.

The Supreme Court of Missouri reversed by a divided vote. The court recognized a right to refuse treatment embodied in the common-law doctrine of informed consent, but expressed skepticism about the application of that doctrine in the circumstances of this case. *Cruzan* v. *Harmon*, 760 S. W. 2d 408, 416–417 (1988) (en banc). The court also declined to read a broad right of privacy into the State Constitution which would "support the right of a person to refuse medical treatment in every circumstance," and expressed doubt as to whether such a right existed under the United States Constitution. *Id.*, at 417–418. It then decided that the Missouri Living Will statute, Mo. Rev. Stat. § 459.010 *et seq.* (1986), embodied a state policy strongly favoring the preservation of life. 760 S. W. 2d, at 419–420. The court found that Cruzan's statements to her roommate regarding her desire to live or die under certain conditions were "unreliable for the purpose of determining her intent," *id.*, at 424, "and thus insufficient to support the co-guardians['] claim to exercise substituted judgment on Nancy's behalf." *Id.*, at 426. It rejected the argument that Cruzan's parents were entitled to order the termination of her medical treatment,

concluding that "no person can assume that choice for an incompetent in the absence of the formalities required under Missouri's Living Will statutes or the clear and convincing, inherently reliable evidence absent here." *Id.*, at 425. The court also expressed its view that "[b]road policy questions bearing on life and death are more properly addressed by representative assemblies" than judicial bodies. *Id.*, at 426.

We granted certiorari to consider the question whether Cruzan has a right under the United States Constitution which would require the hospital to withdraw life-sustaining treatment from her under these circumstances.

At common law, even the touching of one person by another without consent and without legal justification was a battery. See W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts § 9, pp. 39–42 (5th ed. 1984). Before the turn of the century, this Court observed that "[n]o right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." *Union Pacific R. Co.* v. *Botsford*, 141 U. S. 250, 251 (1891). This notion of bodily integrity has been embodied in the requirement that informed consent is generally required for medical treatment. Justice Cardozo, while on the Court of Appeals of New York, aptly described this doctrine: "Every human being of adult years and sound mind has a right to determine what shall be done with his own body; and a surgeon who performs an operation without his patient's consent commits an assault, for which he is liable in damages." *Schloendorff* v. *Society of New York Hospital*, 211 N. Y. 125, 129–130, 105 N. E. 92, 93 (1914). The informed consent doctrine has become firmly entrenched in American tort law. See Keeton, Dobbs, Keeton, & Owen, *supra*, § 32, pp. 189–192; F. Rozovsky, Consent to Treatment, A Practical Guide 1–98 (2d ed. 1990).

The logical corollary of the doctrine of informed consent is that the patient generally possesses the right not to consent, that is, to refuse treatment. Until about 15 years ago and the seminal decision in *In re Quinlan*, 70 N. J. 10, 355 A. 2d 647, cert. denied *sub nom. Garger* v. *New Jersey*, 429 U. S. 922 (1976), the number of right-to-refuse-treatment decisions was relatively few.[2] Most of the earlier cases involved patients who refused medical treatment forbidden by their religious beliefs, thus implicating First Amendment rights as well as common-law rights of self-determination.[3] More recently, however, with the advance of medical technology capable of sustaining life well past the point where natural forces would have brought certain death in earlier times, cases involving the right to refuse life-sustaining treatment have burgeoned. See 760 S. W. 2d, at 412, n. 4 (collecting 54 reported decisions from 1976 through 1988).

In the *Quinlan* case, young Karen Quinlan suffered severe brain damage as the result of anoxia and entered a persistent vegetative state. Karen's father sought judicial approval to disconnect his daughter's respirator. The New Jersey Supreme Court granted the relief, holding that Karen had a right of privacy grounded in the Federal Constitution to terminate treatment. *In re Quinlan*, 70 N. J., at 38–42, 355 A. 2d, at 662–664. Recognizing that this right was not absolute, however, the court balanced it against asserted state interests. Noting that the State's interest "weakens and the individual's right to privacy grows as the degree of bodily invasion increases and the prognosis dims," the court concluded that the state interests had to give way in that case. *Id.*, at

---

[2] See generally Karnezis, Patient's Right to Refuse Treatment Allegedly Necessary to Sustain Life, 93 A. L. R. 3d 67 (1979) (collecting cases); Cantor, A Patient's Decision to Decline Life-Saving Medical Treatment: Bodily Integrity Versus the Preservation of Life, 26 Rutgers L. Rev. 228, 229, and n. 5 (1973) (noting paucity of cases).

[3] See Chapman, The Uniform Rights of the Terminally Ill Act: Too Little, Too Late?, 42 Ark. L. Rev. 319, 324, n. 15 (1989); see also F. Rozovsky, Consent to Treatment, A Practical Guide 415–423 (1984).

41, 355 A. 2d, at 664. The court also concluded that the "only practical way" to prevent the loss of Karen's privacy right due to her incompetence was to allow her guardian and family to decide "whether she would exercise it in these circumstances." *Ibid.*

After *Quinlan*, however, most courts have based a right to refuse treatment either solely on the common-law right to informed consent or on both the common-law right and a constitutional privacy right. See L. Tribe, American Constitutional Law § 15–11, p. 1365 (2d ed. 1988). In *Superintendent of Belchertown State School* v. *Saikewicz*, 373 Mass. 728, 370 N. E. 2d 417 (1977), the Supreme Judicial Court of Massachusetts relied on both the right of privacy and the right of informed consent to permit the withholding of chemotherapy from a profoundly retarded 67-year-old man suffering from leukemia. *Id.*, at 737–738, 370 N. E. 2d, at 424. Reasoning that an incompetent person retains the same rights as a competent individual "because the value of human dignity extends to both," the court adopted a "substituted judgment" standard whereby courts were to determine what an incompetent individual's decision would have been under the circumstances. *Id.*, at 745, 752–753, 757–758, 370 N. E. 2d, at 427, 431, 434. Distilling certain state interests from prior case law—the preservation of life, the protection of the interests of innocent third parties, the prevention of suicide, and the maintenance of the ethical integrity of the medical profession—the court recognized the first interest as paramount and noted it was greatest when an affliction was curable, "as opposed to the State interest where, as here, the issue is not whether, but when, for how long, and at what cost to the individual [a] life may be briefly extended." *Id.*, at 742, 370 N. E. 2d, at 426.

In *In re Storar*, 52 N. Y. 2d 363, 420 N. E. 2d 64, cert. denied, 454 U. S. 858 (1981), the New York Court of Appeals declined to base a right to refuse treatment on a constitutional privacy right. Instead, it found such a right "ade-

quately supported" by the informed consent doctrine. *Id.*, at 376–377, 420 N. E. 2d, at 70. In *In re Eichner* (decided with *In re Storar, supra*), an 83-year-old man who had suffered brain damage from anoxia entered a vegetative state and was thus incompetent to consent to the removal of his respirator. The court, however, found it unnecessary to reach the question whether his rights could be exercised by others since it found the evidence clear and convincing from statements made by the patient when competent that he "did not want to be maintained in a vegetative coma by use of a respirator." *Id.*, at 380, 420 N. E. 2d, at 72. In the companion *Storar* case, a 52-year-old man suffering from bladder cancer had been profoundly retarded during most of his life. Implicitly rejecting the approach taken in *Saikewicz, supra*, the court reasoned that due to such life-long incompetency, "it is unrealistic to attempt to determine whether he would want to continue potentially life prolonging treatment if he were competent." 52 N. Y. 2d, at 380, 420 N. E. 2d, at 72. As the evidence showed that the patient's required blood transfusions did not involve excessive pain and without them his mental and physical abilities would deteriorate, the court concluded that it should not "allow an incompetent patient to bleed to death because someone, even someone as close as a parent or sibling, feels that this is best for one with an incurable disease." *Id.*, at 382, 420 N. E. 2d, at 73.

Many of the later cases build on the principles established in *Quinlan, Saikewicz,* and *Storar/Eichner.* For instance, in *In re Conroy*, 98 N. J. 321, 486 A. 2d 1209 (1985), the same court that decided *Quinlan* considered whether a nasogastric feeding tube could be removed from an 84-year-old incompetent nursing-home resident suffering irreversible mental and physical ailments. While recognizing that a federal right of privacy might apply in the case, the court, contrary to its approach in *Quinlan*, decided to base its decision on the common-law right to self-determination and informed con-

sent. 98 N. J., at 348, 486 A. 2d, at 1223. "On balance, the right to self-determination ordinarily outweighs any countervailing state interests, and competent persons generally are permitted to refuse medical treatment, even at the risk of death. Most of the cases that have held otherwise, unless they involved the interest in protecting innocent third parties, have concerned the patient's competency to make a rational and considered choice." *Id.*, at 353–354, 486 A. 2d, at 1225.

Reasoning that the right of self-determination should not be lost merely because an individual is unable to sense a violation of it, the court held that incompetent individuals retain a right to refuse treatment. It also held that such a right could be exercised by a surrogate decisionmaker using a "subjective" standard when there was clear evidence that the incompetent person would have exercised it. Where such evidence was lacking, the court held that an individual's right could still be invoked in certain circumstances under objective "best interest" standards. *Id.*, at 361–368, 486 A. 2d, at 1229–1233. Thus, if some trustworthy evidence existed that the individual would have wanted to terminate treatment, but not enough to clearly establish a person's wishes for purposes of the subjective standard, and the burden of a prolonged life from the experience of pain and suffering markedly outweighed its satisfactions, treatment could be terminated under a "limited-objective" standard. Where no trustworthy evidence existed, and a person's suffering would make the administration of life-sustaining treatment inhumane, a "pure-objective" standard could be used to terminate treatment. If none of these conditions obtained, the court held it was best to err in favor of preserving life. *Id.*, at 364–368, 486 A. 2d, at 1231–1233.

The court also rejected certain categorical distinctions that had been drawn in prior refusal-of-treatment cases as lacking substance for decision purposes: the distinction between actively hastening death by terminating treatment and pas-

sively allowing a person to die of a disease; between treating individuals as an initial matter versus withdrawing treatment afterwards; between ordinary versus extraordinary treatment; and between treatment by artificial feeding versus other forms of life-sustaining medical procedures. *Id.*, at 369–374, 486 A. 2d, at 1233–1237. As to the last item, the court acknowledged the "emotional significance" of food, but noted that feeding by implanted tubes is a "medical procedur[e] with inherent risks and possible side effects, instituted by skilled health-care providers to compensate for impaired physical functioning" which analytically was equivalent to artificial breathing using a respirator. *Id.*, at 373, 486 A. 2d, at 1236.[4]

In contrast to *Conroy*, the Court of Appeals of New York recently refused to accept less than the clearly expressed wishes of a patient before permitting the exercise of her right to refuse treatment by a surrogate decisionmaker. *In re Westchester County Medical Center on behalf of O'Connor*, 72 N. Y. 2d 517, 531 N. E. 2d 607 (1988) *(O'Connor)*. There, the court, over the objection of the patient's family members, granted an order to insert a feeding tube into a 77-year-old

---

[4] In a later trilogy of cases, the New Jersey Supreme Court stressed that the analytic framework adopted in *Conroy* was limited to elderly, incompetent patients with shortened life expectancies, and established alternative approaches to deal with a different set of situations. See *In re Farrell*, 108 N. J. 335, 529 A. 2d 404 (1987) (37-year-old competent mother with terminal illness had right to removal of respirator based on common law and constitutional principles which overrode competing state interests); *In re Peter*, 108 N. J. 365, 529 A. 2d 419 (1987) (65-year-old woman in persistent vegetative state had right to removal of nasogastric feeding tube—under *Conroy* subjective test, power of attorney and hearsay testimony constituted clear and convincing proof of patient's intent to have treatment withdrawn); *In re Jobes*, 108 N. J. 394, 529 A. 2d 434 (1987) (31-year-old woman in persistent vegetative state entitled to removal of jejunostomy feeding tube—even though hearsay testimony regarding patient's intent insufficient to meet clear and convincing standard of proof, under *Quinlan*, family or close friends entitled to make a substituted judgment for patient).

woman rendered incompetent as a result of several strokes. While continuing to recognize a common-law right to refuse treatment, the court rejected the substituted judgment approach for asserting it "because it is inconsistent with our fundamental commitment to the notion that no person or court should substitute its judgment as to what would be an acceptable quality of life for another. Consequently, we adhere to the view that, despite its pitfalls and inevitable uncertainties, the inquiry must always be narrowed to the patient's expressed intent, with every effort made to minimize the opportunity for error." *Id.*, at 530, 531 N. E. 2d, at 613 (citation omitted). The court held that the record lacked the requisite clear and convincing evidence of the patient's expressed intent to withhold life-sustaining treatment. *Id.*, at 531–534, 531 N. E. 2d, at 613–615.

Other courts have found state statutory law relevant to the resolution of these issues. In *Conservatorship of Drabick*, 200 Cal. App. 3d 185, 245 Cal. Rptr. 840, cert. denied, 488 U. S. 958 (1988), the California Court of Appeal authorized the removal of a nasogastric feeding tube from a 44-year-old man who was in a persistent vegetative state as a result of an auto accident. Noting that the right to refuse treatment was grounded in both the common law and a constitutional right of privacy, the court held that a state probate statute authorized the patient's conservator to order the withdrawal of life-sustaining treatment when such a decision was made in good faith based on medical advice and the conservatee's best interests. While acknowledging that "to claim that [a patient's] 'right to choose' survives incompetence is a legal fiction at best," the court reasoned that the respect society accords to persons as individuals is not lost upon incompetence and is best preserved by allowing others "to make a decision that reflects [a patient's] interests more closely than would a purely technological decision to do whatever is possible."[5]

[5] The *Drabick* court drew support for its analysis from earlier, influential decisions rendered by California Courts of Appeal. See *Bouvia* v. *Su-*

*Id.*, at 208, 245 Cal. Rptr., at 854–855. See also *In re Conservatorship of Torres,* 357 N. W. 2d 332 (Minn. 1984) (Minnesota court had constitutional and statutory authority to authorize a conservator to order the removal of an incompetent individual's respirator since in patient's best interests).

In *In re Estate of Longeway,* 133 Ill. 2d 33, 549 N. E. 2d 292 (1989), the Supreme Court of Illinois considered whether a 76-year-old woman rendered incompetent from a series of strokes had a right to the discontinuance of artificial nutrition and hydration. Noting that the boundaries of a federal right of privacy were uncertain, the court found a right to refuse treatment in the doctrine of informed consent. *Id.,* at 43–45, 549 N. E. 2d, at 296–297. The court further held that the State Probate Act impliedly authorized a guardian to exercise a ward's right to refuse artificial sustenance in the event that the ward was terminally ill and irreversibly comatose. *Id.,* at 45–47, 549 N. E. 2d, at 298. Declining to adopt a best interests standard for deciding when it would be appropriate to exercise a ward's right because it "lets another make a determination of a patient's quality of life," the court opted instead for a substituted judgment standard. *Id.,* at 49, 549 N. E. 2d, at 299. Finding the "expressed intent" standard utilized in *O'Connor, supra,* too rigid, the court noted that other clear and convincing evidence of the patient's intent could be considered. 133 Ill. 2d, at 50–51, 549 N. E. 2d, at 300. The court also adopted the "consensus opinion [that] treats artificial nutrition and hydration as medical treatment." *Id.,* at 42, 549 N. E. 2d, at 296. Cf. *McConnell* v. *Beverly Enterprises-Connecticut, Inc.,* 209 Conn. 692, 705,

---

*perior Court,* 179 Cal. App. 3d 1127, 225 Cal. Rptr. 297 (1986) (competent 28-year-old quadriplegic had right to removal of nasogastric feeding tube inserted against her will); *Bartling* v. *Superior Court,* 163 Cal. App. 3d 186, 209 Cal. Rptr. 220 (1984) (competent 70-year-old, seriously ill man had right to the removal of respirator); *Barber* v. *Superior Court,* 147 Cal. App. 3d 1006, 195 Cal. Rptr. 484 (1983) (physicians could not be prosecuted for homicide on account of removing respirator and intravenous feeding tubes of patient in persistent vegetative state).

553 A. 2d 596, 603 (1989) (right to withdraw artificial nutrition and hydration found in the Connecticut Removal of Life Support Systems Act, which "provid[es] functional guidelines for the exercise of the common law and constitutional rights of self-determination"; attending physician authorized to remove treatment after finding that patient is in a terminal condition, obtaining consent of family, and considering expressed wishes of patient).[6]

As these cases demonstrate, the common-law doctrine of informed consent is viewed as generally encompassing the right of a competent individual to refuse medical treatment. Beyond that, these cases demonstrate both similarity and diversity in their approaches to decision of what all agree is a perplexing question with unusually strong moral and ethical overtones. State courts have available to them for decision a number of sources—state constitutions, statutes, and common law—which are not available to us. In this Court, the question is simply and starkly whether the United States Constitution prohibits Missouri from choosing the rule of decision which it did. This is the first case in which we have been squarely presented with the issue whether the United States Constitution grants what is in common parlance referred to as a "right to die." We follow the judicious counsel of our decision in *Twin City Bank* v. *Nebeker*, 167 U. S. 196, 202 (1897), where we said that in deciding "a ques-

---

[6] Besides the Missouri Supreme Court in *Cruzan* and the courts in *McConnell*, *Longeway*, *Drabick*, *Bouvia*, *Barber*, *O'Connor*, *Conroy*, *Jobes*, and *Peter*, appellate courts of at least four other States and one Federal District Court have specifically considered and discussed the issue of withholding or withdrawing artificial nutrition and hydration from incompetent individuals. See *Gray* v. *Romeo*, 697 F. Supp. 580 (RI 1988); *In re Gardner*, 534 A. 2d 947 (Me. 1987); *In re Grant*, 109 Wash. 2d 545, 747 P. 2d 445 (1987); *Brophy* v. *New England Sinai Hospital, Inc.*, 398 Mass. 417, 497 N. E. 2d 626 (1986); *Corbett* v. *D'Alessandro*, 487 So. 2d 368 (Fla. App. 1986). All of these courts permitted or would permit the termination of such measures based on rights grounded in the common law, or in the State or Federal Constitution.

tion of such magnitude and importance . . . it is the [better] part of wisdom not to attempt, by any general statement, to cover every possible phase of the subject."

The Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property, without due process of law." The principle that a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment may be inferred from our prior decisions. In *Jacobson* v. *Massachusetts*, 197 U. S. 11, 24–30 (1905), for instance, the Court balanced an individual's liberty interest in declining an unwanted smallpox vaccine against the State's interest in preventing disease. Decisions prior to the incorporation of the Fourth Amendment into the Fourteenth Amendment analyzed searches and seizures involving the body under the Due Process Clause and were thought to implicate substantial liberty interests. See, *e. g.*, *Breithaupt* v. *Abram*, 352 U. S. 432, 439 (1957) ("As against the right of an individual that his person be held inviolable . . . must be set the interests of society . . .").

Just this Term, in the course of holding that a State's procedures for administering antipsychotic medication to prisoners were sufficient to satisfy due process concerns, we recognized that prisoners possess "a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment." *Washington* v. *Harper*, 494 U. S. 210, 221–222 (1990); see also *id.*, at 229 ("The forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty"). Still other cases support the recognition of a general liberty interest in refusing medical treatment. *Vitek* v. *Jones*, 445 U. S. 480, 494 (1980) (transfer to mental hospital coupled with mandatory behavior modification treatment implicated liberty interests); *Parham* v. *J. R.*, 442 U. S. 584, 600 (1979) ("[A] child, in common with adults, has a substantial liberty

interest in not being confined unnecessarily for medical treatment").

But determining that a person has a "liberty interest" under the Due Process Clause does not end the inquiry;[7] "whether respondent's constitutional rights have been violated must be determined by balancing his liberty interests against the relevant state interests." *Youngberg* v. *Romeo*, 457 U. S. 307, 321 (1982). See also *Mills* v. *Rogers*, 457 U. S. 291, 299 (1982).

Petitioners insist that under the general holdings of our cases, the forced administration of life-sustaining medical treatment, and even of artificially delivered food and water essential to life, would implicate a competent person's liberty interest. Although we think the logic of the cases discussed above would embrace such a liberty interest, the dramatic consequences involved in refusal of such treatment would inform the inquiry as to whether the deprivation of that interest is constitutionally permissible. But for purposes of this case, we assume that the United States Constitution would grant a competent person a constitutionally protected right to refuse lifesaving hydration and nutrition.

Petitioners go on to assert that an incompetent person should possess the same right in this respect as is possessed by a competent person. They rely primarily on our decisions in *Parham* v. *J. R.*, *supra*, and *Youngberg* v. *Romeo*, *supra*. In *Parham*, we held that a mentally disturbed minor child had a liberty interest in "not being confined unnecessarily for medical treatment," 442 U. S., at 600, but we certainly did not intimate that such a minor child, after commitment, would have a liberty interest in refusing treatment. In *Youngberg*, we held that a seriously retarded adult had a lib-

---

[7] Although many state courts have held that a right to refuse treatment is encompassed by a generalized constitutional right of privacy, we have never so held. We believe this issue is more properly analyzed in terms of a Fourteenth Amendment liberty interest. See *Bowers* v. *Hardwick*, 478 U. S. 186, 194–195 (1986).

erty interest in safety and freedom from bodily restraint, 457 U. S., at 320. *Youngberg,* however, did not deal with decisions to administer or withhold medical treatment.

The difficulty with petitioners' claim is that in a sense it begs the question: An incompetent person is not able to make an informed and voluntary choice to exercise a hypothetical right to refuse treatment or any other right. Such a "right" must be exercised for her, if at all, by some sort of surrogate. Here, Missouri has in effect recognized that under certain circumstances a surrogate may act for the patient in electing to have hydration and nutrition withdrawn in such a way as to cause death, but it has established a procedural safeguard to assure that the action of the surrogate conforms as best it may to the wishes expressed by the patient while competent. Missouri requires that evidence of the incompetent's wishes as to the withdrawal of treatment be proved by clear and convincing evidence. The question, then, is whether the United States Constitution forbids the establishment of this procedural requirement by the State. We hold that it does not.

Whether or not Missouri's clear and convincing evidence requirement comports with the United States Constitution depends in part on what interests the State may properly seek to protect in this situation. Missouri relies on its interest in the protection and preservation of human life, and there can be no gainsaying this interest. As a general matter, the States—indeed, all civilized nations—demonstrate their commitment to life by treating homicide as a serious crime. Moreover, the majority of States in this country have laws imposing criminal penalties on one who assists another to commit suicide.[8] We do not think a State is required to remain neutral in the face of an informed and voluntary decision by a physically able adult to starve to death.

---

[8] See Smith, All's Well That Ends Well: Toward a Policy of Assisted Rational Suicide or Merely Enlightened Self-Determination?, 22 U. C. D. L. Rev. 275, 290–291, and n. 106 (1989) (compiling statutes).

But in the context presented here, a State has more particular interests at stake. The choice between life and death is a deeply personal decision of obvious and overwhelming finality. We believe Missouri may legitimately seek to safeguard the personal element of this choice through the imposition of heightened evidentiary requirements. It cannot be disputed that the Due Process Clause protects an interest in life as well as an interest in refusing life-sustaining medical treatment. Not all incompetent patients will have loved ones available to serve as surrogate decisionmakers. And even where family members are present, "[t]here will, of course, be some unfortunate situations in which family members will not act to protect a patient." *In re Jobes*, 108 N. J. 394, 419, 529 A. 2d 434, 447 (1987). A State is entitled to guard against potential abuses in such situations. Similarly, a State is entitled to consider that a judicial proceeding to make a determination regarding an incompetent's wishes may very well not be an adversarial one, with the added guarantee of accurate factfinding that the adversary process brings with it.[9] See *Ohio* v. *Akron Center for Reproductive*

---

[9] Since Cruzan was a patient at a state hospital when this litigation commenced, the State has been involved as an adversary from the beginning. However, it can be expected that many disputes of this type will arise in private institutions, where a guardian ad litem or similar party will have been appointed as the sole representative of the incompetent individual in the litigation. In such cases, a guardian may act in entire good faith, and yet not maintain a position truly adversarial to that of the family. Indeed, as noted by the court below, "[t]he guardian *ad litem* [in this case] finds himself in the predicament of believing that it is in Nancy's 'best interest to have the tube feeding discontinued,' but 'feeling that an appeal should be made because our responsibility to her as attorneys and guardians *ad litem* was to pursue this matter to the highest court in the state in view of the fact that this is a case of first impression in the State of Missouri.'" 760 S. W. 2d, at 410, n. 1. Cruzan's guardian ad litem has also filed a brief in this Court urging reversal of the Missouri Supreme Court's decision. None of this is intended to suggest that the guardian acted the least bit improperly in this proceeding. It is only meant to illustrate the limits which may obtain on the adversarial nature of this type of litigation.

*Health, post,* at 515–516. Finally, we think a State may properly decline to make judgments about the "quality" of life that a particular individual may enjoy, and simply assert an unqualified interest in the preservation of human life to be weighed against the constitutionally protected interests of the individual.

In our view, Missouri has permissibly sought to advance these interests through the adoption of a "clear and convincing" standard of proof to govern such proceedings. "The function of a standard of proof, as that concept is embodied in the Due Process Clause and in the realm of factfinding, is to 'instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication.'" *Addington* v. *Texas,* 441 U. S. 418, 423 (1979) (quoting *In re Winship,* 397 U. S. 358, 370 (1970) (Harlan, J., concurring)). "This Court has mandated an intermediate standard of proof—'clear and convincing evidence'—when the individual interests at stake in a state proceeding are both 'particularly important' and 'more substantial than mere loss of money.'" *Santosky* v. *Kramer,* 455 U. S. 745, 756 (1982) (quoting *Addington, supra,* at 424). Thus, such a standard has been required in deportation proceedings, *Woodby* v. *INS,* 385 U. S. 276 (1966), in denaturalization proceedings, *Schneiderman* v. *United States,* 320 U. S. 118 (1943), in civil commitment proceedings, *Addington, supra,* and in proceedings for the termination of parental rights, *Santosky, supra.*[10] Fur-

---

[10] We recognize that these cases involved instances where the government sought to take action against an individual. See *Price Waterhouse* v. *Hopkins,* 490 U. S. 228, 253 (1989) (plurality opinion). Here, by contrast, the government seeks to protect the interests of an individual, as well as its own institutional interests, in life. We do not see any reason why important individual interests should be afforded less protection simply because the government finds itself in the position of defending them. "[W]e find it significant that . . . the defendant rather than the plaintiff" seeks the clear and convincing standard of proof—"suggesting that this standard

ther, this level of proof, "or an even higher one, has traditionally been imposed in cases involving allegations of civil fraud, and in a variety of other kinds of civil cases involving such issues as . . . lost wills, oral contracts to make bequests, and the like." *Woodby, supra,* at 285, n. 18.

We think it self-evident that the interests at stake in the instant proceedings are more substantial, both on an individual and societal level, than those involved in a run-of-the-mine civil dispute. But not only does the standard of proof reflect the importance of a particular adjudication, it also serves as "a societal judgment about how the risk of error should be distributed between the litigants." *Santosky, supra,* at 755; *Addington, supra,* at 423. The more stringent the burden of proof a party must bear, the more that party bears the risk of an erroneous decision. We believe that Missouri may permissibly place an increased risk of an erroneous decision on those seeking to terminate an incompetent individual's life-sustaining treatment. An erroneous decision not to terminate results in a maintenance of the status quo; the possibility of subsequent developments such as advancements in medical science, the discovery of new evidence regarding the patient's intent, changes in the law, or simply the unexpected death of the patient despite the administration of life-sustaining treatment at least create the potential that a wrong decision will eventually be corrected or its impact mitigated. An erroneous decision to withdraw life-sustaining treatment, however, is not susceptible of correction. In *Santosky,* one of the factors which led the Court to require proof by clear and convincing evidence in a proceeding to terminate parental rights was that a decision in such a case was final and irrevocable. *Santosky, supra,* at 759. The same must surely be said of the decision to discontinue hydration and nutrition of a patient such as Nancy Cruzan, which all agree will result in her death.

---

ordinarily serves as a shield rather than . . . a sword." *Id.,* at 253. That it is the government that has picked up the shield should be of no moment.

It is also worth noting that most, if not all, States simply forbid oral testimony entirely in determining the wishes of parties in transactions which, while important, simply do not have the consequences that a decision to terminate a person's life does. At common law and by statute in most States, the parol evidence rule prevents the variations of the terms of a written contract by oral testimony. The statute of frauds makes unenforceable oral contracts to leave property by will, and statutes regulating the making of wills universally require that those instruments be in writing. See 2 A. Corbin, Contracts § 398, pp. 360–361 (1950); 2 W. Page, Law of Wills §§ 19.3–19.5, pp. 61–71 (1960). There is no doubt that statutes requiring wills to be in writing, and statutes of frauds which require that a contract to make a will be in writing, on occasion frustrate the effectuation of the intent of a particular decedent, just as Missouri's requirement of proof in this case may have frustrated the effectuation of the not-fully-expressed desires of Nancy Cruzan. But the Constitution does not require general rules to work faultlessly; no general rule can.

In sum, we conclude that a State may apply a clear and convincing evidence standard in proceedings where a guardian seeks to discontinue nutrition and hydration of a person diagnosed to be in a persistent vegetative state. We note that many courts which have adopted some sort of substituted judgment procedure in situations like this, whether they limit consideration of evidence to the prior expressed wishes of the incompetent individual, or whether they allow more general proof of what the individual's decision would have been, require a clear and convincing standard of proof for such evidence. See, e. g., *Longeway*, 133 Ill. 2d, at 50–51, 549 N. E. 2d, at 300; *McConnell*, 209 Conn., at 707–710, 553 A. 2d, at 604–605; *O'Connor*, 72 N. Y. 2d, at 529–530, 531 N. E. 2d, at 613; *In re Gardner*, 534 A. 2d 947, 952–953 (Me. 1987); *In re Jobes*, 108 N. J., at 412–413, 529 A. 2d,

at 443; *Leach* v. *Akron General Medical Center*, 68 Ohio Misc. 1, 11, 426 N. E. 2d 809, 815 (1980).

The Supreme Court of Missouri held that in this case the testimony adduced at trial did not amount to clear and convincing proof of the patient's desire to have hydration and nutrition withdrawn. In so doing, it reversed a decision of the Missouri trial court which had found that the evidence "suggest[ed]" Nancy Cruzan would not have desired to continue such measures, App. to Pet. for Cert. A98, but which had not adopted the standard of "clear and convincing evidence" enunciated by the Supreme Court. The testimony adduced at trial consisted primarily of Nancy Cruzan's statements made to a housemate about a year before her accident that she would not want to live should she face life as a "vegetable," and other observations to the same effect. The observations did not deal in terms with withdrawal of medical treatment or of hydration and nutrition. We cannot say that the Supreme Court of Missouri committed constitutional error in reaching the conclusion that it did.[11]

Petitioners alternatively contend that Missouri must accept the "substituted judgment" of close family members even in the absence of substantial proof that their views re-

---

[11] The clear and convincing standard of proof has been variously defined in this context as "proof sufficient to persuade the trier of fact that the patient held a firm and settled commitment to the termination of life supports under the circumstances like those presented," *In re Westchester County Medical Center on behalf of O'Connor*, 72 N. Y. 2d 517, 531, 531 N. E. 2d 607, 613 (1988) *(O'Connor)*, and as evidence which "produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable [the factfinder] to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *In re Jobes*, 108 N. J., at 407–408, 529 A. 2d, at 441 (quotation omitted). In both of these cases the evidence of the patient's intent to refuse medical treatment was arguably stronger than that presented here. The New York Court of Appeals and the Supreme Court of New Jersey, respectively, held that the proof failed to meet a clear and convincing threshold. See *O'Connor, supra*, at 526–534, 531 N. E. 2d, at 610–615; *Jobes, supra*, at 442–443.

flect the views of the patient.  They rely primarily upon our decisions in *Michael H.* v. *Gerald D.*, 491 U. S. 110 (1989), and *Parham* v. *J. R.*, 442 U. S. 584 (1979).  But we do not think these cases support their claim.  In *Michael H.*, we *upheld* the constitutionality of California's favored treatment of traditional family relationships; such a holding may not be turned around into a constitutional requirement that a State *must* recognize the primacy of those relationships in a situation like this.  And in *Parham,* where the patient was a minor, we also *upheld* the constitutionality of a state scheme in which parents made certain decisions for mentally ill minors.  Here again petitioners would seek to turn a decision which allowed a State to rely on family decisionmaking into a constitutional requirement that the State recognize such decisionmaking.  But constitutional law does not work that way.

No doubt is engendered by anything in this record but that Nancy Cruzan's mother and father are loving and caring parents.  If the State were required by the United States Constitution to repose a right of "substituted judgment" with anyone, the Cruzans would surely qualify.  But we do not think the Due Process Clause requires the State to repose judgment on these matters with anyone but the patient herself.  Close family members may have a strong feeling—a feeling not at all ignoble or unworthy, but not entirely disinterested, either—that they do not wish to witness the continuation of the life of a loved one which they regard as hopeless, meaningless, and even degrading.  But there is no automatic assurance that the view of close family members will necessarily be the same as the patient's would have been had she been confronted with the prospect of her situation while competent.  All of the reasons previously discussed for allowing Missouri to require clear and convincing evidence of the patient's wishes lead us to conclude that the State may

choose to defer only to those wishes, rather than confide the decision to close family members.[12]

The judgment of the Supreme Court of Missouri is

*Affirmed.*

JUSTICE O'CONNOR, concurring.

I agree that a protected liberty interest in refusing unwanted medical treatment may be inferred from our prior decisions, see *ante*, at 278–279, and that the refusal of artificially delivered food and water is encompassed within that liberty interest. See *ante*, at 279. I write separately to clarify why I believe this to be so.

As the Court notes, the liberty interest in refusing medical treatment flows from decisions involving the State's invasions into the body. See *ante*, at 278–279. Because our notions of liberty are inextricably entwined with our idea of physical freedom and self-determination, the Court has often deemed state incursions into the body repugnant to the interests protected by the Due Process Clause. See, *e. g.*, *Rochin* v. *California*, 342 U. S. 165, 172 (1952) ("Illegally breaking into the privacy of the petitioner, the struggle to open his mouth and remove what was there, the forcible extraction of his

---

[12] We are not faced in this case with the question whether a State might be required to defer to the decision of a surrogate if competent and probative evidence established that the patient herself had expressed a desire that the decision to terminate life-sustaining treatment be made for her by that individual.

Petitioners also adumbrate in their brief a claim based on the Equal Protection Clause of the Fourteenth Amendment to the effect that Missouri has impermissibly treated incompetent patients differently from competent ones, citing the statement in *Cleburne* v. *Cleburne Living Center, Inc.*, 473 U. S. 432, 439 (1985), that the Clause is "essentially a direction that all persons similarly situated should be treated alike." The differences between the choice made *by* a competent person to refuse medical treatment, and the choice made *for* an incompetent person by someone else to refuse medical treatment, are so obviously different that the State is warranted in establishing rigorous procedures for the latter class of cases which do not apply to the former class.

stomach's contents . . . is bound to offend even hardened sensibilities"); *Union Pacific R. Co.* v. *Botsford,* 141 U. S. 250, 251 (1891). Our Fourth Amendment jurisprudence has echoed this same concern. See *Schmerber* v. *California,* 384 U. S. 757, 772 (1966) ("The integrity of an individual's person is a cherished value of our society"); *Winston* v. *Lee,* 470 U. S. 753, 759 (1985) ("A compelled surgical intrusion into an individual's body for evidence . . . implicates expectations of privacy and security of such magnitude that the intrusion may be 'unreasonable' even if likely to produce evidence of a crime"). The State's imposition of medical treatment on an unwilling competent adult necessarily involves some form of restraint and intrusion. A seriously ill or dying patient whose wishes are not honored may feel a captive of the machinery required for life-sustaining measures or other medical interventions. Such forced treatment may burden that individual's liberty interests as much as any state coercion. See, *e. g., Washington* v. *Harper,* 494 U. S. 210, 221 (1990); *Parham* v. *J. R.,* 442 U. S. 584, 600 (1979) ("It is not disputed that a child, in common with adults, has a substantial liberty interest in not being confined unnecessarily for medical treatment").

The State's artificial provision of nutrition and hydration implicates identical concerns. Artificial feeding cannot readily be distinguished from other forms of medical treatment. See, *e. g.,* Council on Ethical and Judicial Affairs, American Medical Association, AMA Ethical Opinion 2.20, Withholding or Withdrawing Life-Prolonging Medical Treatment, Current Opinions 13 (1989); The Hastings Center, Guidelines on the Termination of Life-Sustaining Treatment and the Care of the Dying 59 (1987). Whether or not the techniques used to pass food and water into the patient's alimentary tract are termed "medical treatment," it is clear they all involve some degree of intrusion and restraint. Feeding a patient by means of a nasogastric tube requires a physician to pass a long flexible tube through the patient's

nose, throat, and esophagus and into the stomach. Because of the discomfort such a tube causes, "[m]any patients need to be restrained forcibly and their hands put into large mittens to prevent them from removing the tube." Major, The Medical Procedures for Providing Food and Water: Indications and Effects, in By No Extraordinary Means: The Choice to Forgo Life-Sustaining Food and Water 25 (J. Lynn ed. 1986). A gastrostomy tube (as was used to provide food and water to Nancy Cruzan, see *ante*, at 266) or jejunostomy tube must be surgically implanted into the stomach or small intestine. Office of Technology Assessment Task Force, Life-Sustaining Technologies and the Elderly 282 (1988). Requiring a competent adult to endure such procedures against her will burdens the patient's liberty, dignity, and freedom to determine the course of her own treatment. Accordingly, the liberty guaranteed by the Due Process Clause must protect, if it protects anything, an individual's deeply personal decision to reject medical treatment, including the artificial delivery of food and water.

I also write separately to emphasize that the Court does not today decide the issue whether a State must also give effect to the decisions of a surrogate decisionmaker. See *ante*, at 287, n. 12. In my view, such a duty may well be constitutionally required to protect the patient's liberty interest in refusing medical treatment. Few individuals provide explicit oral or written instructions regarding their intent to refuse medical treatment should they become incompetent.[1]

---

[1] See 2 President's Commission for the Study of Ethical Problems in Medicine and Biomedical and Behavioral Research, Making Health Care Decisions 241–242 (1982) (36% of those surveyed gave instructions regarding how they would like to be treated if they ever became too sick to make decisions; 23% put those instructions in writing) (Lou Harris Poll, September 1982); American Medical Association Surveys of Physician and Public Opinion on Health Care Issues 29–30 (1988) (56% of those surveyed had told family members their wishes concerning the use of life-sustaining treatment if they entered an irreversible coma; 15% had filled out a living will specifying those wishes).

States which decline to consider any evidence other than such instructions may frequently fail to honor a patient's intent. Such failures might be avoided if the State considered an equally probative source of evidence: the patient's appointment of a proxy to make health care decisions on her behalf. Delegating the authority to make medical decisions to a family member or friend is becoming a common method of planning for the future. See, *e. g.*, Areen, The Legal Status of Consent Obtained from Families of Adult Patients to Withhold or Withdraw Treatment, 258 JAMA 229, 230 (1987). Several States have recognized the practical wisdom of such a procedure by enacting durable power of attorney statutes that specifically authorize an individual to appoint a surrogate to make medical treatment decisions.[2] Some state courts have suggested that an agent appointed pursuant to a general durable power of attorney statute would also be empowered to make health care decisions on behalf of the patient.[3] See, *e. g.*, *In re Peter*, 108 N. J. 365, 378–379, 529

---

[2] At least 13 States and the District of Columbia have durable power of attorney statutes expressly authorizing the appointment of proxies for making health care decisions. See Alaska Stat. Ann. §§ 13.26.335, 13.26.344(*l*) (Supp. 1989); Cal. Civ. Code Ann. § 2500 (West Supp. 1990); D. C. Code Ann. § 21–2205 (1989); Idaho Code § 39–4505 (Supp. 1989); Ill. Rev. Stat., ch. 110½, ¶¶ 804–1 to 804–12 (Supp. 1988); Kan. Stat. Ann. § 58–625 (Supp. 1989); Me. Rev. Stat. Ann., Tit. 18–A, § 5–501 (Supp. 1989); Nev. Rev. Stat. § 449.800 (Supp. 1989); Ohio Rev. Code Ann. § 1337.11 *et seq.* (Supp. 1989); Ore. Rev. Stat. § 127.510 (1989); Pa. Stat. Ann., Tit. 20, § 5603(h) (Purdon Supp. 1989); R. I. Gen. Laws § 23–4.10–1 *et seq.* (1989); Tex. Rev. Civ. Stat. Ann., Art. 4590h–1 (Vernon Supp. 1990); Vt. Stat. Ann., Tit. 14, § 3451 *et seq.* (1989).

[3] All 50 States and the District of Columbia have general durable power of attorney statutes. See Ala. Code § 26–1–2 (1986); Alaska Stat. Ann. §§ 13–26–350 to 13–26–356 (Supp. 1989); Ariz. Rev. Stat. Ann. § 14–5501 (1975); Ark. Code Ann. §§ 28–68–201 to 28–68–203 (1987); Cal. Civ. Code Ann. § 2400 (West Supp. 1990); Colo. Rev. Stat. § 15–14–501 *et seq.* (1987); Conn. Gen. Stat. § 45–69*o* (Supp. 1989); Del. Code Ann., Tit. 12, §§ 4901–4905 (1987); D. C. Code Ann. § 21–2081 *et. seq.* (1989); Fla. Stat. § 709.08 (1989); Ga. Code Ann. § 10–6–36 (1989); Haw. Rev. Stat. §§ 551D–1 to 551D–7 (Supp. 1989); Idaho Code § 15–5–501 *et seq.* (Supp. 1989); Ill. Rev. Stat.,

A. 2d 419, 426 (1987); see also 73 Op. Md. Atty. Gen. No. 88–046 (1988) (interpreting Md. Est. & Trusts Code Ann. §§ 13–601 to 13–602 (1974), as authorizing a delegatee to make health care decisions). Other States allow an individual to designate a proxy to carry out the intent of a living will.[4] These procedures for surrogate decisionmaking, which appear to be rapidly gaining in acceptance, may be a

ch. 110½, ¶ 802–6 (1987); Ind. Code §§ 30–2–11–1 to 30–2–11–7 (1988); Iowa Code § 633.705 (Supp. 1989); Kan. Stat. Ann. § 58–610 (1983); Ky. Rev. Stat. Ann. § 386.093 (Baldwin 1983); La. Civ. Code Ann., Art. 3027 (West Supp. 1990); Me. Rev. Stat. Ann., Tit. 18–A, § 5–501 *et seq.* (Supp. 1989); Md. Est. & Trusts Code Ann. §§ 13–601 to 13–602 (1974) (as interpreted by the Attorney General, see 73 Op. Md. Atty. Gen. No. 88–046 (Oct. 17, 1988)); Mass. Gen. Laws §§ 201B:1 to 201B:7 (1988); Mich. Comp. Laws §§ 700.495, 700.497 (1979); Minn. Stat. § 523.01 *et seq.* (1988); Miss. Code Ann. § 87– 3–13 (Supp. 1989); Mo. Rev. Stat. § 404.700 (Supp. 1990); Mont. Code Ann. §§ 72–5–501 to 72–5–502 (1989); Neb. Rev. Stat. §§ 30–2664 to 30–2672, 30–2667 (1985); Nev. Rev. Stat. § 111.460 *et seq.* (1986); N. H. Rev. Stat. Ann. § 506:6 *et seq.* (Supp. 1989); N. J. Stat. Ann. § 46:2B–8 (West 1989); N. M. Stat. Ann. § 45–5–501 *et seq.* (1989); N. Y. Gen. Oblig. Law § 5–1602 (McKinney 1989); N. C. Gen. Stat. § 32A–1 *et seq.* (1987); N. D. Cent. Code §§ 30.1–30–01 to 30.1–30–05 (Supp. 1989); Ohio Rev. Code Ann. § 1337.09 (Supp. 1989); Okla. Stat., Tit. 58, §§ 1071–1077 (Supp. 1989); Ore. Rev. Stat. § 127.005 (1989); Pa. Stat. Ann., Tit. 20, §§ 5601 *et seq.*, 5602(a)(9) (Purdon Supp. 1989); R. I. Gen. Laws § 34–22–6.1 (1984); S. C. Code Ann. §§ 62–5–501 to 62–5–502 (1987); S. D. Codified Laws § 59–7–2.1 (1978); Tenn. Code Ann. § 34–6–101 *et seq.* (1984); Tex. Prob. Code Ann. § 36A (Supp. 1990); Utah Code Ann. § 75–5–501 *et seq.* (1978); Vt. Stat. Ann., Tit. 14, § 3051 *et seq.* (1989); Va. Code Ann. § 11–9.1 *et seq.* (1989); Wash. Rev. Code § 11.94.020 (1989); W. Va. Code § 39–4–1 *et seq.* (Supp. 1989); Wis. Stat. § 243.07 (1987–1988) (as interpreted by the Attorney General, see Wis. Op. Atty. Gen. 35–88 (1988)); Wyo. Stat. § 3–5–101 *et seq.* (1985).

[4] Thirteen States have living will statutes authorizing the appointment of health care proxies. See Ark. Code Ann. § 20–17–202 (Supp. 1989); Del. Code Ann., Tit. 16, § 2502 (1983); Fla. Stat. § 765.05(2) (1989); Idaho Code § 39–4504 (Supp. 1989); Ind. Code § 16–8–11–14(g)(2) (1988); Iowa Code § 144A.7(1)(a) (1989); La. Rev. Stat. Ann. §§ 40:1299.58.1, 40:1299.58.3(C) (West Supp. 1990); Minn. Stat. § 145B.01 *et seq.* (Supp. 1989); Tex. Health & Safety Code Ann. § 672.003(d) (Supp. 1990); Utah Code Ann. §§ 75–2–1105, 75–2–1106 (Supp. 1989); Va. Code Ann. § 54.1–2986(2) (1988); 1987 Wash. Laws, ch. 162, § 1(1)(b); Wyo. Stat. § 35–22–102 (1988).

valuable additional safeguard of the patient's interest in directing his medical care. Moreover, as patients are likely to select a family member as a surrogate, see 2 President's Commission for the Study of Ethical Problems in Medicine and Biomedical and Behavioral Research, Making Health Care Decisions 240 (1982), giving effect to a proxy's decisions may also protect the "freedom of personal choice in matters of . . . family life." *Cleveland Board of Education* v. *LaFleur*, 414 U. S. 632, 639 (1974).

Today's decision, holding only that the Constitution permits a State to require clear and convincing evidence of Nancy Cruzan's desire to have artificial hydration and nutrition withdrawn, does not preclude a future determination that the Constitution requires the States to implement the decisions of a patient's duly appointed surrogate. Nor does it prevent States from developing other approaches for protecting an incompetent individual's liberty interest in refusing medical treatment. As is evident from the Court's survey of state court decisions, see *ante*, at 271–277, no national consensus has yet emerged on the best solution for this difficult and sensitive problem. Today we decide only that one State's practice does not violate the Constitution; the more challenging task of crafting appropriate procedures for safeguarding incompetents' liberty interests is entrusted to the "laboratory" of the States, *New State Ice Co.* v. *Liebmann*, 285 U. S. 262, 311 (1932) (Brandeis, J., dissenting), in the first instance.

JUSTICE SCALIA, concurring.

The various opinions in this case portray quite clearly the difficult, indeed agonizing, questions that are presented by the constantly increasing power of science to keep the human body alive for longer than any reasonable person would want to inhabit it. The States have begun to grapple with these problems through legislation. I am concerned, from the tenor of today's opinions, that we are poised to confuse that

enterprise as successfully as we have confused the enterprise of legislating concerning abortion—requiring it to be conducted against a background of federal constitutional imperatives that are unknown because they are being newly crafted from Term to Term. That would be a great misfortune.

While I agree with the Court's analysis today, and therefore join in its opinion, I would have preferred that we announce, clearly and promptly, that the federal courts have no business in this field; that American law has always accorded the State the power to prevent, by force if necessary, suicide—including suicide by refusing to take appropriate measures necessary to preserve one's life; that the point at which life becomes "worthless," and the point at which the means necessary to preserve it become "extraordinary" or "inappropriate," are neither set forth in the Constitution nor known to the nine Justices of this Court any better than they are known to nine people picked at random from the Kansas City telephone directory; and hence, that even when it *is* demonstrated by clear and convincing evidence that a patient no longer wishes certain measures to be taken to preserve his or her life, it is up to the citizens of Missouri to decide, through their elected representatives, whether that wish will be honored. It is quite impossible (because the Constitution says nothing about the matter) that those citizens will decide upon a line less lawful than the one we would choose; and it is unlikely (because we know no more about "life and death" than they do) that they will decide upon a line less reasonable.

The text of the Due Process Clause does not protect individuals against deprivations of liberty *simpliciter*. It protects them against deprivations of liberty "without due process of law." To determine that such a deprivation would not occur if Nancy Cruzan were forced to take nourishment against her will, it is unnecessary to reopen the historically recurrent debate over whether "due process" includes substantive restrictions. Compare *Murray's Lessee v. Hoboken Land and Improvement Co.*, 18 How. 272 (1856), with *Scott*

v. *Sandford,* 19 How. 393, 450 (1857); compare *Tyson & Brother* v. *Banton,* 273 U. S. 418 (1927), with *Olsen* v. *Nebraska ex rel. Western Reference & Bond Assn., Inc.,* 313 U. S. 236, 246–247 (1941); compare *Ferguson* v. *Skrupa,* 372 U. S. 726, 730 (1963), with *Moore* v. *East Cleveland,* 431 U. S. 494 (1977) (plurality opinion); see Easterbrook, Substance and Due Process, 1982 S. Ct. Rev. 85; Monaghan, Our Perfect Constitution, 56 N. Y. U. L. Rev. 353 (1981). It is at least true that no "substantive due process" claim can be maintained unless the claimant demonstrates that the State has deprived him of a right historically and traditionally protected against state interference. *Michael H.* v. *Gerald D.,* 491 U. S. 110, 122 (1989) (plurality opinion); *Bowers* v. *Hardwick,* 478 U. S. 186, 192 (1986); *Moore, supra,* at 502–503 (plurality opinion). That cannot possibly be established here.

At common law in England, a suicide—defined as one who "deliberately puts an end to his own existence, or commits any unlawful malicious act, the consequence of which is his own death," 4 W. Blackstone, Commentaries *189—was criminally liable. *Ibid.* Although the States abolished the penalties imposed by the common law (*i. e.,* forfeiture and ignominious burial), they did so to spare the innocent family and not to legitimize the act. Case law at the time of the adoption of the Fourteenth Amendment generally held that assisting suicide was a criminal offense. See Marzen, O'Dowd, Crone, & Balch, Suicide: A Constitutional Right?, 24 Duquesne L. Rev. 1, 76 (1985) ("In short, twenty-one of the thirty-seven states, and eighteen of the thirty ratifying states prohibited assisting suicide. Only eight of the states, and seven of the ratifying states, definitely did not"); see also 1 F. Wharton, Criminal Law § 122 (6th rev. ed. 1868). The System of Penal Law presented to the House of Representatives by Representative Livingston in 1828 would have criminalized assisted suicide. E. Livingston, A System of Penal Law, Penal Code 122 (1828). The Field Penal Code,

adopted by the Dakota Territory in 1877, proscribed attempted suicide and assisted suicide. Marzen, O'Dowd, Crone, & Balch, *supra*, at 76–77. And most States that did not explicitly prohibit assisted suicide in 1868 recognized, when the issue arose in the 50 years following the Fourteenth Amendment's ratification, that assisted and (in some cases) attempted suicide were unlawful. *Id.*, at 77–100; *id.*, at 148–242 (surveying development of States' laws). Thus, "there is no significant support for the claim that a right to suicide is so rooted in our tradition that it may be deemed 'fundamental' or 'implicit in the concept of ordered liberty.'" *Id.*, at 100 (quoting *Palko* v. *Connecticut*, 302 U. S. 319, 325 (1937)).

Petitioners rely on three distinctions to separate Nancy Cruzan's case from ordinary suicide: (1) that she is permanently incapacitated and in pain; (2) that she would bring on her death not by any affirmative act but by merely declining treatment that provides nourishment; and (3) that preventing her from effectuating her presumed wish to die requires violation of her bodily integrity. None of these suffices. Suicide was not excused even when committed "to avoid those ills which [persons] had not the fortitude to endure." 4 Blackstone, *supra*, at \*189. "The life of those to whom life has become a burden—of those who are hopelessly diseased or fatally wounded—nay, even the lives of criminals condemned to death, are under the protection of the law, equally as the lives of those who are in the full tide of life's enjoyment, and anxious to continue to live." *Blackburn* v. *State*, 23 Ohio St. 146, 163 (1873). Thus, a man who prepared a poison, and placed it within reach of his wife, "to put an end to her suffering" from a terminal illness was convicted of murder, *People* v. *Roberts*, 211 Mich. 187, 198, 178 N. W. 690, 693 (1920); the "incurable suffering of the suicide, as a legal question, could hardly affect the degree of criminality . . . ." Note, 30 Yale L. J. 408, 412 (1921) (discussing *Roberts*). Nor would the imminence of the patient's death have

affected liability. "The lives of all are equally under the protection of the law, and under that protection to their last moment. . . . [Assisted suicide] is declared by the law to be murder, irrespective of the wishes or the condition of the party to whom the poison is administered . . . ." *Blackburn, supra,* at 163; see also *Commonwealth* v. *Bowen,* 13 Mass. 356, 360 (1816).

The second asserted distinction—suggested by the recent cases canvassed by the Court concerning the right to refuse treatment, *ante,* at 270–277—relies on the dichotomy between action and inaction. Suicide, it is said, consists of an affirmative act to end one's life; refusing treatment is not an affirmative act "causing" death, but merely a passive acceptance of the natural process of dying. I readily acknowledge that the distinction between action and inaction has some bearing upon the legislative judgment of what ought to be prevented as suicide—though even there it would seem to me unreasonable to draw the line precisely between action and inaction, rather than between various forms of inaction. It would not make much sense to say that one may not kill oneself by walking into the sea, but may sit on the beach until submerged by the incoming tide; or that one may not intentionally lock oneself into a cold storage locker, but may refrain from coming indoors when the temperature drops below freezing. Even as a legislative matter, in other words, the intelligent line does not fall between action and inaction but between those forms of inaction that consist of abstaining from "ordinary" care and those that consist of abstaining from "excessive" or "heroic" measures. Unlike action versus inaction, that is not a line to be discerned by logic or legal analysis, and we should not pretend that it is.

But to return to the principal point for present purposes: the irrelevance of the action-inaction distinction. Starving oneself to death is no different from putting a gun to one's temple as far as the common-law definition of suicide is concerned; the cause of death in both cases is the suicide's con-

scious decision to "pu[t] an end to his own existence." 4 Blackstone, *supra*, at \*189. See *In re Caulk*, 125 N. H. 226, 232, 480 A. 2d 93, 97 (1984); *State ex rel. White* v. *Narick*, 170 W. Va. 195, 292 S. E. 2d 54 (1982); *Von Holden* v. *Chapman*, 87 App. Div. 2d 66, 450 N. Y. S. 2d 623 (1982). Of course the common law rejected the action-inaction distinction in other contexts involving the taking of human life as well. In the prosecution of a parent for the starvation death of her infant, it was no defense that the infant's death was "caused" by no action of the parent but by the natural process of starvation, or by the infant's natural inability to provide for itself. See *Lewis* v. *State*, 72 Ga. 164 (1883); *People* v. *McDonald*, 49 Hun 67, 1 N. Y. S. 703 (5th Dept., App. Div. 1888); *Commonwealth* v. *Hall*, 322 Mass. 523, 528, 78 N. E. 2d 644, 647 (1948) (collecting cases); F. Wharton, Law of Homicide §§ 134–135, 304 (2d ed. 1875); 2 J. Bishop, Commentaries on Criminal Law § 686 (5th ed. 1872); J. Hawley & M. McGregor, Criminal Law 152 (3d ed. 1899). A physician, moreover, could be criminally liable for failure to provide care that could have extended the patient's life, even if death was immediately caused by the underlying disease that the physician failed to treat. *Barrow* v. *State*, 17 Okla. Cr. 340, 188 P. 351 (1920); *People* v. *Phillips*, 64 Cal. 2d 574, 414 P. 2d 353 (1966).

It is not surprising, therefore, that the early cases considering the claimed right to refuse medical treatment dismissed as specious the nice distinction between "passively submitting to death and actively seeking it. The distinction may be merely verbal, as it would be if an adult sought death by starvation instead of a drug. If the State may interrupt one mode of self-destruction, it may with equal authority interfere with the other." *John F. Kennedy Memorial Hosp.* v. *Heston*, 58 N. J. 576, 581–582, 279 A. 2d 670, 672–673 (1971); see also *Application of President & Directors of Georgetown College, Inc.*, 118 U. S. App. D. C. 80, 88–89, 331 F. 2d 1000,

1008–1009 (Wright, J., in chambers), cert. denied, 377 U. S. 978 (1964).

The third asserted basis of distinction—that frustrating Nancy Cruzan's wish to die in the present case requires interference with her bodily integrity—is likewise inadequate, because such interference is impermissible only if one begs the question whether her refusal to undergo the treatment on her own is suicide.  It has always been lawful not only for the State, but even for private citizens, to interfere with bodily integrity to prevent a felony.  See *Phillips* v. *Trull,* 11 Johns. 486 (N. Y. 1814); *City Council* v. *Payne,* 2 Nott & McCord 475 (S. C. 1821); *Vandeveer* v. *Mattocks,* 3 Ind. 479 (1852); T. Cooley, Law of Torts 174–175 (1879); Wilgus, Arrest Without a Warrant, 22 Mich. L. Rev. 673 (1924); Restatement of Torts § 119 (1934).  That general rule has of course been applied to suicide.  At common law, even a private person's use of force to prevent suicide was privileged. *Colby* v. *Jackson,* 12 N. H. 526, 530–531 (1842); *Look* v. *Choate,* 108 Mass. 116, 120 (1871); *Commonwealth* v. *Mink,* 123 Mass. 422, 429 (1877); *In re Doyle,* 16 R. I. 537, 539, 18 A. 159, 159–160 (1889); *Porter* v. *Ritch,* 70 Conn. 235, 255, 39 A. 169, 175 (1898); *Emmerich* v. *Thorley,* 35 App. Div. 452, 456, 54 N. Y. S. 791, 793–794 (1898); *State* v. *Hembd,* 305 Minn. 120, 130, 232 N. W. 2d 872, 878 (1975); 2 C. Addison, Law of Torts § 819 (1876); Cooley, *supra,* at 179–180.  It is not even reasonable, much less required by the Constitution, to maintain that although the State has the right to prevent a person from slashing his wrists, it does not have the power to apply physical force to prevent him from doing so, nor the power, should he succeed, to apply, coercively if necessary, medical measures to stop the flow of blood.  The state-run hospital, I am certain, is not liable under 42 U. S. C. § 1983 for violation of constitutional rights, nor the private hospital liable under general tort law, if, in a State where suicide is unlawful, it pumps out the stomach of a person who has inten-

tionally taken an overdose of barbiturates, despite that person's wishes to the contrary.

The dissents of JUSTICES BRENNAN and STEVENS make a plausible case for our intervention here only by embracing—the latter explicitly and the former by implication—a political principle that the States are free to adopt, but that is demonstrably not imposed by the Constitution. "[T]he State," says JUSTICE BRENNAN, "has no legitimate general interest in someone's life, completely abstracted from the interest of the person living that life, that could outweigh the person's choice *to avoid medical treatment*." *Post*, at 313 (emphasis added). The italicized phrase sounds moderate enough and is all that is needed to cover the present case—but the proposition cannot *logically* be so limited. One who accepts it must also accept, I think, that the State has no such legitimate interest that could outweigh "the person's choice *to put an end to her life*." Similarly, if one agrees with JUSTICE BRENNAN that "the State's general interest in life must accede to Nancy Cruzan's particularized and intense interest in self-determination *in her choice of medical treatment*," *post*, at 314 (emphasis added), he must also believe that the State must accede to her "particularized and intense interest in self-determination *in her choice whether to continue living or to die*." For insofar as balancing the relative interests of the State and the individual is concerned, there is nothing distinctive about accepting death through the refusal of "medical treatment," as opposed to accepting it through the refusal of food, or through the failure to shut off the engine and get out of the car after parking in one's garage after work. Suppose that Nancy Cruzan were in precisely the condition she is in today, except that she could be fed and digest food and water *without* artificial assistance. How is the State's "interest" in keeping her alive thereby increased, or her interest in deciding whether she wants to continue living reduced? It seems to me, in other words, that JUSTICE BRENNAN's position ultimately rests upon the proposition that it is none of the State's

business if a person wants to commit suicide. JUSTICE STE-VENS is explicit on the point: "Choices about death touch the core of liberty. . . . [N]ot much may be said with confidence about death unless it is said from faith, and that alone is reason enough to protect the freedom to conform choices about death to individual conscience." *Post*, at 343. This is a view that some societies have held, and that our States are free to adopt if they wish. But it is not a view imposed by our constitutional traditions, in which the power of the State to prohibit suicide is unquestionable.

What I have said above is not meant to suggest that I would think it desirable, if we were sure that Nancy Cruzan wanted to die, to keep her alive by the means at issue here. I assert only that the Constitution has nothing to say about the subject. To raise up a constitutional right here we would have to create out of nothing (for it exists neither in text nor tradition) some constitutional principle whereby, although the State may insist that an individual come in out of the cold and eat food, it may not insist that he take medicine; and although it may pump his stomach empty of poison he has ingested, it may not fill his stomach with food he has failed to ingest. Are there, then, no reasonable and humane limits that ought not to be exceeded in requiring an individual to preserve his own life? There obviously are, but they are not set forth in the Due Process Clause. What assures us that those limits will not be exceeded is the same constitutional guarantee that is the source of most of our protection—what protects us, for example, from being assessed a tax of 100% of our income above the subsistence level, from being forbidden to drive cars, or from being required to send our children to school for 10 hours a day, none of which horribles are categorically prohibited by the Constitution. Our salvation is the Equal Protection Clause, which requires the democratic majority to accept for themselves and their loved ones what they impose on you and me. This Court need not, and has no authority to, inject itself into every field of human activity

where irrationality and oppression may theoretically occur, and if it tries to do so it will destroy itself.

JUSTICE BRENNAN, with whom JUSTICE MARSHALL and JUSTICE BLACKMUN join, dissenting.

> "Medical technology has effectively created a twilight zone of suspended animation where death commences while life, in some form, continues. Some patients, however, want no part of a life sustained only by medical technology. Instead, they prefer a plan of medical treatment that allows nature to take its course and permits them to die with dignity."[1]

Nancy Cruzan has dwelt in that twilight zone for six years. She is oblivious to her surroundings and will remain so. *Cruzan* v. *Harmon*, 760 S. W. 2d 408, 411 (Mo. 1988). Her body twitches only reflexively, without consciousness. *Ibid.* The areas of her brain that once thought, felt, and experienced sensations have degenerated badly and are continuing to do so. The cavities remaining are filling with cerebrospinal fluid. The "'cerebral cortical atrophy is irreversible, permanent, progressive and ongoing.'" *Ibid.* "Nancy will never interact meaningfully with her environment again. She will remain in a persistent vegetative state until her death." *Id.*, at 422.[2] Because she cannot swallow, her nutrition and hydration are delivered through a tube surgically implanted in her stomach.

A grown woman at the time of the accident, Nancy had previously expressed her wish to forgo continuing medical care under circumstances such as these. Her family and her

---

[1] *Rasmussen* v. *Fleming*, 154 Ariz. 207, 211, 741 P. 2d 674, 678 (1987) (en banc).

[2] Vegetative state patients may *react reflexively* to sounds, movements, and normally painful stimuli, but they do not *feel* any pain or *sense* anybody or anything. Vegetative state patients may appear awake but are completely unaware. See Cranford, The Persistent Vegetative State: The Medical Reality, 18 Hastings Ctr. Rep. 27, 28, 31 (1988).

friends are convinced that this is what she would want. See n. 20, *infra*. A guardian ad litem appointed by the trial court is also convinced that this is what Nancy would want. See 760 S. W. 2d, at 444 (Higgins, J., dissenting from denial of rehearing). Yet the Missouri Supreme Court, alone among state courts deciding such a question, has determined that an irreversibly vegetative patient will remain a passive prisoner of medical technology—for Nancy, perhaps for the next 30 years. See *id.*, at 424, 427.

Today the Court, while tentatively accepting that there is some degree of constitutionally protected liberty interest in avoiding unwanted medical treatment, including life-sustaining medical treatment such as artificial nutrition and hydration, affirms the decision of the Missouri Supreme Court. The majority opinion, as I read it, would affirm that decision on the ground that a State may require "clear and convincing" evidence of Nancy Cruzan's prior decision to forgo life-sustaining treatment under circumstances such as hers in order to ensure that her actual wishes are honored. See *ante*, at 282–283, 286–287. Because I believe that Nancy Cruzan has a fundamental right to be free of unwanted artificial nutrition and hydration, which right is not out-weighed by any interests of the State, and because I find that the improperly biased procedural obstacles imposed by the Missouri Supreme Court impermissibly burden that right, I respectfully dissent. Nancy Cruzan is entitled to choose to die with dignity.

I

A

"[T]he timing of death—once a matter of fate—is now a matter of human choice." Office of Technology Assessment Task Force, Life Sustaining Technologies and the Elderly 41 (1988). Of the approximately 2 million people who die each year, 80% die in hospitals and long-term care institutions,[3]

---

[3] See President's Commission for the Study of Ethical Problems in Medicine and Biomedical and Behavioral Research, Deciding to Forego Life

and perhaps 70% of those after a decision to forgo life-sustaining treatment has been made.[4]   Nearly every death involves a decision whether to undertake some medical procedure that could prolong the process of dying.   Such decisions are difficult and personal.   They must be made on the basis of individual values, informed by medical realities, yet within a framework governed by law.   The role of the courts is confined to defining that framework, delineating the ways in which government may and may not participate in such decisions.

The question before this Court is a relatively narrow one: whether the Due Process Clause allows Missouri to require a now-incompetent patient in an irreversible persistent vegetative state to remain on life support absent rigorously clear and convincing evidence that avoiding the treatment represents the patient's prior, express choice.   See *ante*, at 277–278.   If a fundamental right is at issue, Missouri's rule of decision must be scrutinized under the standards this Court has always applied in such circumstances.   As we said in *Zablocki* v. *Redhail*, 434 U. S. 374, 388 (1978), if a requirement imposed by a State "significantly interferes with the exercise of a fundamental right, it cannot be upheld unless it is supported by sufficiently important state interests and is closely tailored to effectuate only those interests."   The Constitution imposes on this Court the obligation to "examine carefully . . . the extent to which [the legitimate government interests advanced] are served by the challenged regulation." *Moore* v. *East Cleveland*, 431 U. S. 494, 499 (1977).   See also *Carey* v. *Population Services International*, 431 U. S. 678, 690 (1977) (invalidating a requirement that bore "no relation to the State's interest").   An evidentiary rule, just as a substantive prohibition, must meet these standards if it significantly burdens a fundamental liberty interest.   Funda-

---

Sustaining Treatment 15, n. 1, and 17–18 (1983) (hereafter President's Commission).

[4] See Lipton, Do-Not-Resuscitate Decisions in a Community Hospital: Incidence, Implications and Outcomes, 256 JAMA 1164, 1168 (1986).

mental rights "are protected not only against heavy-handed frontal attack, but also from being stifled by more subtle governmental interference." *Bates* v. *Little Rock*, 361 U. S. 516, 523 (1960).

B

The starting point for our legal analysis must be whether a competent person has a constitutional right to avoid unwanted medical care. Earlier this Term, this Court held that the Due Process Clause of the Fourteenth Amendment confers a significant liberty interest in avoiding unwanted medical treatment. *Washington* v. *Harper*, 494 U. S. 210, 221–222 (1990). Today, the Court concedes that our prior decisions "support the recognition of a general liberty interest in refusing medical treatment." See *ante*, at 278. The Court, however, avoids discussing either the measure of that liberty interest or its application by assuming, for purposes of this case only, that a competent person has a constitutionally protected liberty interest in being free of unwanted artificial nutrition and hydration. See *ante*, at 279. JUSTICE O'CONNOR's opinion is less parsimonious. She openly affirms that "the Court has often deemed state incursions into the body repugnant to the interests protected by the Due Process Clause," that there is a liberty interest in avoiding unwanted medical treatment, and that it encompasses the right to be free of "artificially delivered food and water." See *ante*, at 287.

But if a competent person has a liberty interest to be free of unwanted medical treatment, as both the majority and JUSTICE O'CONNOR concede, it must be fundamental. "We are dealing here with [a decision] which involves one of the basic civil rights of man." *Skinner* v. *Oklahoma ex rel. Williamson*, 316 U. S. 535, 541 (1942) (invalidating a statute authorizing sterilization of certain felons). Whatever other liberties protected by the Due Process Clause are fundamental, "those liberties that are 'deeply rooted in this Nation's history and tradition'" are among them. *Bowers* v. *Hardwick*,

478 U. S. 186, 192 (1986) (quoting *Moore* v. *East Cleveland*, *supra*, at 503 (plurality opinion). "Such a tradition commands respect in part because the Constitution carries the gloss of history." *Richmond Newspapers, Inc.* v. *Virginia*, 448 U. S. 555, 589 (1980) (BRENNAN, J., concurring in judgment).

The right to be free from medical attention without consent, to determine what shall be done with one's own body, *is* deeply rooted in this Nation's traditions, as the majority acknowledges. See *ante*, at 270. This right has long been "firmly entrenched in American tort law" and is securely grounded in the earliest common law. *Ante*, at 269. See also *Mills* v. *Rogers*, 457 U. S. 291, 294, n. 4 (1982) ("[T]he right to refuse any medical treatment emerged from the doctrines of trespass and battery, which were applied to unauthorized touchings by a physician"). "Anglo-American law starts with the premise of thorough-going self determination. It follows that each man is considered to be master of his own body, and he may, if he be of sound mind, expressly prohibit the performance of lifesaving surgery, or other medical treatment." *Natanson* v. *Kline*, 186 Kan. 393, 406–407, 350 P. 2d 1093, 1104 (1960). "The inviolability of the person" has been held as "sacred" and "carefully guarded" as any common-law right. *Union Pacific R. Co.* v. *Botsford*, 141 U. S. 250, 251–252 (1891). Thus, freedom from unwanted medical attention is unquestionably among those principles "so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Snyder* v. *Massachusetts*, 291 U. S. 97, 105 (1934).[5]

---

[5] See, *e. g.*, *Canterbury* v. *Spence*, 150 U. S. App. D. C. 263, 271, 464 F. 2d 772, 780, cert. denied, 409 U. S. 1064 (1972) ("The root premise" of informed consent "is the concept, fundamental in American jurisprudence, that '[e]very human being of adult years and sound mind has a right to determine what shall be done with his own body'") (quoting *Schloendorff* v. *Society of New York Hospital*, 211 N. Y. 125, 129–130, 105 N. E. 92, 93 (1914) (Cardozo, J.)). See generally *Washington* v. *Harper*, 494 U. S. 210, 241 (1990) (STEVENS, J., dissenting) ("There is no doubt . . . that a

That there may be serious consequences involved in refusal of the medical treatment at issue here does not vitiate the right under our common-law tradition of medical self-determination. It is "a well-established rule of general law . . . that it is the patient, not the physician, who ultimately decides if treatment—any treatment—is to be given at all. . . . The rule has never been qualified in its application by either the nature or purpose of the treatment, or the gravity of the consequences of acceding to or foregoing it." *Tune* v. *Walter Reed Army Medical Hospital*, 602 F. Supp. 1452, 1455 (DC 1985). See also *Downer* v. *Veilleux*, 322 A. 2d 82, 91 (Me. 1974) ("The rationale of this rule lies in the fact that every competent adult has the right to forego treatment, or even cure, if it entails what for him are intolerable consequences or risks, however unwise his sense of values may be to others").[6]

---

competent individual's right to refuse [psychotropic] medication is a fundamental liberty interest deserving the highest order of protection").

[6] Under traditional tort law, exceptions have been found only to protect dependent children. See *Cruzan* v. *Harmon*, 760 S. W. 2d 408, 422, n. 17 (Mo. 1988) (citing cases where Missouri courts have ordered blood transfusions for children over the religious objection of parents); see also *Winthrop University Hospital* v. *Hess*, 128 Misc. 2d 804, 490 N. Y. S. 2d 996 (Sup. Ct. Nassau Cty. 1985) (court ordered blood transfusion for religious objector because she was the mother of an infant and had explained that her objection was to the signing of the consent, not the transfusion itself); *Application of President & Directors of Georgetown College, Inc.*, 118 U. S. App. D. C. 80, 88, 331 F. 2d 1000, 1008 (blood transfusion ordered for mother of infant), cert. denied, 377 U. S. 978 (1964). Cf. *In re Estate of Brooks*, 32 Ill. 2d 361, 373, 205 N. E. 2d 435, 441–442 (1965) (finding that lower court erred in ordering a blood transfusion for a woman—whose children were grown—and concluding: "Even though we may consider appellant's beliefs unwise, foolish or ridiculous, in the absence of an overriding danger to society we may not permit interference therewith in the form of a conservatorship established in the waning hours of her life for the sole purpose of compelling her to accept medical treatment forbidden by her religious principles, and previously refused by her with full knowledge of the probable consequences").

No material distinction can be drawn between the treatment to which Nancy Cruzan continues to be subject — artificial nutrition and hydration—and any other medical treatment. See *ante*, at 288–289 (O'CONNOR, J., concurring). The artificial delivery of nutrition and hydration is undoubtedly medical treatment. The technique to which Nancy Cruzan is subject — artificial feeding through a gastrostomy tube—involves a tube implanted surgically into her stomach through incisions in her abdominal wall. It may obstruct the intestinal tract, erode and pierce the stomach wall, or cause leakage of the stomach's contents into the abdominal cavity. See Page, Andrassy, & Sandler, Techniques in Delivery of Liquid Diets, in Nutrition in Clinical Surgery 66–67 (M. Deitel 2d ed. 1985). The tube can cause pneumonia from reflux of the stomach's contents into the lung. See Bernard & Forlaw, Complications and Their Prevention, in Enteral and Tube Feeding 553 (J. Rombeau & M. Caldwell eds. 1984). Typically, and in this case (see Tr. 377), commercially prepared formulas are used, rather than fresh food. See Matarese, Enteral Alimentation, in Surgical Nutrition 726 (J. Fischer ed. 1983). The type of formula and method of administration must be experimented with to avoid gastrointestinal problems. *Id.*, at 748. The patient must be monitored daily by medical personnel as to weight, fluid intake, and fluid output; blood tests must be done weekly. *Id.*, at 749, 751.

Artificial delivery of food and water is regarded as medical treatment by the medical profession and the Federal Government.[7] According to the American Academy of Neurology:

---

[7] The Missouri court appears to be alone among state courts to suggest otherwise, 760 S. W. 2d, at 419 and 423, although the court did not rely on a distinction between artificial feeding and other forms of medical treatment. *Id.*, at 423. See, *e. g.*, *Delio* v. *Westchester County Medical Center*, 129 App. Div. 2d 1, 19, 516 N. Y. S. 2d 677, 689 (1987) ("[R]eview of the decisions in other jurisdictions . . . failed to uncover a single case in which a court confronted with an application to discontinue feeding by artificial means has evaluated medical procedures to provide nutrition and hydration differently from other types of life-sustaining procedures").

"The artificial provision of nutrition and hydration is a form of medical treatment . . . analogous to other forms of life-sustaining treatment, such as the use of the respirator. When a patient is unconscious, both a respirator and an artificial feeding device serve to support or replace normal bodily functions that are compromised as a result of the patient's illness." Position of the American Academy of Neurology on Certain Aspects of the Care and Management of the Persistent Vegetative State Patient, 39 Neurology 125 (Jan. 1989). See also Council on Ethical and Judicial Affairs of the American Medical Association, Current Opinions, Opinion 2.20 (1989) ("Life-prolonging medical treatment includes medication and artifically or technologically supplied respiration, nutrition or hydration"); President's Commission 88 (life-sustaining treatment includes respirators, kidney dialysis machines, and special feeding procedures). The Federal Government permits the cost of the medical devices and formulas used in enteral feeding to be reimbursed under Medicare. See Pub. L. 99–509, § 9340, note following 42 U. S. C. § 1395u, p. 592 (1982 ed., Supp. V). The formulas are regulated by the federal Food and Drug Administration as "medical foods," see 21 U. S. C. § 360ee, and the feeding tubes are regulated as medical devices, 21 CFR § 876.5980 (1989).

Nor does the fact that Nancy Cruzan is now incompetent deprive her of her fundamental rights. See *Youngberg* v. *Romeo*, 457 U. S. 307, 315–316, 319 (1982) (holding that severely retarded man's liberty interests in safety, freedom from bodily restraint, and reasonable training survive involuntary commitment); *Parham* v. *J. R.*, 442 U. S. 584, 600 (1979) (recognizing a child's substantial liberty interest in not being confined unnecessarily for medical treatment); *Jackson* v. *Indiana*, 406 U. S. 715, 730, 738 (1972) (holding that Indiana could not violate the due process and equal protection rights of a mentally retarded deaf mute by committing him for an indefinite amount of time simply because he was incompetent to stand trial on the criminal charges filed against

him). As the majority recognizes, *ante*, at 280, the question is not whether an incompetent has constitutional rights, but how such rights may be exercised. As we explained in *Thompson* v. *Oklahoma*, 487 U. S. 815 (1988): "The law must often adjust the manner in which it affords rights to those whose status renders them unable to exercise choice freely and rationally. Children, the insane, and *those who are irreversibly ill with loss of brain function, for instance, all retain 'rights,'* to be sure, but often such rights are only meaningful as they are exercised by agents acting with the best interests of their principals in mind." *Id.*, at 825, n. 23 (emphasis added). "To deny [its] exercise because the patient is unconscious or incompetent would be to deny the right." *Foody* v. *Manchester Memorial Hospital*, 40 Conn. Super. 127, 133, 482 A. 2d 713, 718 (1984).

## II

### A

The right to be free from unwanted medical attention is a right to evaluate the potential benefit of treatment and its possible consequences according to one's own values and to make a personal decision whether to subject oneself to the intrusion. For a patient like Nancy Cruzan, the sole benefit of medical treatment is being kept metabolically alive. Neither artificial nutrition nor any other form of medical treatment available today can cure or in any way ameliorate her condition.[8] Irreversibly vegetative patients are devoid of thought,

---

[8] While brain stem cells can survive 15 to 20 minutes without oxygen, cells in the cerebral hemispheres are destroyed if they are deprived of oxygen for as few as 4 to 6 minutes. See Cranford & Smith, Some Critical Distinctions Between Brain Death and the Persistent Vegetative State, 6 Ethics Sci. & Med. 199, 203 (1979). It is estimated that Nancy's brain was deprived of oxygen from 12 to 14 minutes. See *ante*, at 266. Out of the 100,000 patients who, like Nancy, have fallen into persistive vegetative states in the past 20 years due to loss of oxygen to the brain, there have been only three even partial recoveries documented in the medical literature. Brief for American Medical Association et al. as *Amici Curiae*

emotion, and sensation; they are permanently and completely unconscious. See n. 2, *supra*.[9] As the President's Commission concluded in approving the withdrawal of life support equipment from irreversibly vegetative patients:

> "[T]reatment ordinarily aims to benefit a patient through preserving life, relieving pain and suffering, protecting against disability, and returning maximally effective functioning. If a prognosis of permanent unconsciousness is correct, however, continued treatment cannot confer such benefits. Pain and suffering are absent, as are joy, satisfaction, and pleasure. Disability is total and no return to an even minimal level of social or human functioning is possible." President's Commission 181–182.

There are also affirmative reasons why someone like Nancy might choose to forgo artificial nutrition and hydration under these circumstances. Dying is personal. And it is profound. For many, the thought of an ignoble end, steeped in decay, is abhorrent. A quiet, proud death, bodily integ-

---

11–12. The longest any person has ever been in a persistent vegetative state and recovered was 22 months. See Snyder, Cranford, Rubens, Bundlie, & Rockswold, Delayed Recovery from Postanoxic Persistent Vegetative State, 14 Annals Neurol. 156 (1983). Nancy has been in this state for seven years.

[9] The American Academy of Neurology offers three independent bases on which the medical profession rests these neurological conclusions:

"First, direct clinical experience with these patients demonstrates that there is no behavioral indication of any awareness of pain or suffering.

"Second, in all persistent vegetative state patients studied to date, post-mortem examination reveals overwhelming bilateral damage to the cerebral hemispheres to a degree incompatible with consciousness . . . .

"Third, recent data utilizing positron emission tomography indicates that the metabolic rate for glucose in the cerebral cortex is greatly reduced in persistent vegetative state patients, to a degree incompatible with consciousness." Position of the American Academy of Neurology on Certain Aspects of the Care and Management of the Persistent Vegetative State Patient, 39 Neurology 125 (Jan. 1989).

rity intact, is a matter of extreme consequence. "In certain, thankfully rare, circumstances the burden of maintaining the corporeal existence degrades the very humanity it was meant to serve." *Brophy* v. *New England Sinai Hospital, Inc.*, 398 Mass. 417, 434, 497 N. E. 2d 626, 635–636 (1986) (finding the subject of the proceeding "in a condition which [he] has indicated he would consider to be degrading and without human dignity" and holding that "[t]he duty of the State to preserve life must encompass a recognition of an individual's right to avoid circumstances in which the individual himself would feel that efforts to sustain life demean or degrade his humanity"). Another court, hearing a similar case, noted:

> "It is apparent from the testimony that what was on [the patient's] mind was not only the invasiveness of life-sustaining systems, such as the [nasogastric] tube, upon the integrity of his body. It was also the utter helplessness of the permanently comatose person, the wasting of a once strong body, and the submission of the most private bodily functions to the attention of others." *In re Gardner*, 534 A. 2d 947, 953 (Me. 1987).

Such conditions are, for many, humiliating to contemplate,[10] as is visiting a prolonged and anguished vigil on one's parents, spouse, and children. A long, drawn-out death can have a debilitating effect on family members. See Carnwath & Johnson, Psychiatric Morbidity Among Spouses of Patients With Stroke, 294 Brit. Med. J. 409 (1987); Livingston, Families Who Care, 291 Brit. Med. J. 919 (1985). For some, the idea of being remembered in their persistent vegetative

---

[10] Nancy Cruzan, for instance, is totally and permanently disabled. All four of her limbs are severely contracted; her fingernails cut into her wrists. App. to Pet. for Cert. A93. She is incontinent of bowel and bladder. The most intimate aspects of her existence are exposed to and controlled by strangers. Brief for Respondent Guardian Ad Litem 2. Her family is convinced that Nancy would find this state degrading. See n. 20, *infra.*

states rather than as they were before their illness or accident may be very disturbing.[11]

B

Although the right to be free of unwanted medical intervention, like other constitutionally protected interests, may not be absolute,[12] no state interest could outweigh the rights of an individual in Nancy Cruzan's position. Whatever a State's possible interests in mandating life-support treatment under other circumstances, there is no good to be obtained here by Missouri's insistence that Nancy Cruzan remain on life-support systems if it is indeed her wish not to do so. Missouri does not claim, nor could it, that society as a whole will be benefited by Nancy's receiving medical treatment.

[11] What general information exists about what most people would choose or would prefer to have chosen for them under these circumstances also indicates the importance of ensuring a means for now-incompetent patients to exercise their right to avoid unwanted medical treatment. A 1988 poll conducted by the American Medical Association found that 80% of those surveyed favored withdrawal of life-support systems from hopelessly ill or irreversibly comatose patients if they or their families requested it. New York Times, June 5, 1988, p. 14, col. 4 (citing American Medical News, June 3, 1988, p. 9, col. 1). Another 1988 poll conducted by the Colorado University Graduate School of Public Affairs showed that 85% of those questioned would not want to have their own lives maintained with artificial nutrition and hydration if they became permanently unconscious. The Coloradoan, Sept. 29, 1988, p. 1.

Such attitudes have been translated into considerable political action. Since 1976, 40 States and the District of Columbia have enacted natural death Acts, expressly providing for self-determination under some or all of these situations. See Brief for Society for the Right to Die, Inc., as *Amicus Curiae* 8; Weiner, Privacy, Family, and Medical Decision Making for Persistent Vegetative Patients, 11 Cardozo L. Rev. 713, 720 (1990). Thirteen States and the District of Columbia have enacted statutes authorizing the appointment of proxies for making health care decisions. See *ante*, at 290, n. 2 (O'CONNOR, J., concurring).

[12] See *Jacobson* v. *Massachusetts*, 197 U. S. 11, 26–27 (1905) (upholding a Massachusetts law imposing fines or imprisonment on those refusing to be vaccinated as "of paramount necessity" to that State's fight against a smallpox epidemic).

No third party's situation will be improved and no harm to others will be averted. Cf. nn. 6 and 8, *supra*.[13]

The only state interest asserted here is a general interest in the preservation of life.[14] But the State has no legitimate general interest in someone's life, completely abstracted from the interest of the person living that life, that could outweigh the person's choice to avoid medical treatment. "[T]he regulation of constitutionally protected decisions . . . must be predicated on legitimate state concerns *other than* disagreement with the choice the individual has made. . . . Otherwise, the interest in liberty protected by the Due Process Clause would be a nullity." *Hodgson* v. *Minnesota, post,* at

---

[13] Were such interests at stake, however, I would find that the Due Process Clause places limits on what invasive medical procedures could be forced on an unwilling comatose patient in pursuit of the interests of a third party. If Missouri were correct that its interests outweigh Nancy's interest in avoiding medical procedures as long as she is free of pain and physical discomfort, see 760 S. W. 2d, at 424, it is not apparent why a State could not choose to remove one of her kidneys without consent on the ground that society would be better off if the recipient of that kidney were saved from renal poisoning. Nancy cannot feel surgical pain. See n. 2, *supra.* Nor would removal of one kidney be expected to shorten her life expectancy. See The American Medical Association Family Medical Guide 506 (J. Kunz ed. 1982). Patches of her skin could also be removed to provide grafts for burn victims and scrapings of bone marrow to provide grafts for someone with leukemia. Perhaps the State could lawfully remove more vital organs for transplanting into others who would then be cured of their ailments, provided the State placed Nancy on some other life-support equipment to replace the lost function. Indeed, why could the State not perform medical experiments on her body, experiments that might save countless lives, and would cause her no greater burden than she already bears by being fed through the gastrostomy tube? This would be too brave a new world for me and, I submit, for our Constitution.

[14] The Missouri Supreme Court reviewed the state interests that had been identified by other courts as potentially relevant — prevention of homicide and suicide, protection of interests of innocent third parties, maintenance of the ethical integrity of the medical profession, and preservation of life — and concluded that: "In this case, only the state's interest in the preservation of life is implicated." 760 S. W. 2d, at 419.

435 (opinion of STEVENS, J.) (emphasis added). Thus, the State's general interest in life must accede to Nancy Cruzan's particularized and intense interest in self-determination in her choice of medical treatment. There is simply nothing legitimately within the State's purview to be gained by superseding her decision.

Moreover, there may be considerable danger that Missouri's rule of decision would impair rather than serve any interest the State does have in sustaining life. Current medical practice recommends use of heroic measures if there is a scintilla of a chance that the patient will recover, on the assumption that the measures will be discontinued should the patient improve. When the President's Commission in 1982 approved the withdrawal of life-support equipment from irreversibly vegetative patients, it explained that "[a]n even more troubling wrong occurs when a treatment that might save life or improve health is not started because the health care personnel are afraid that they will find it very difficult to stop the treatment if, as is fairly likely, it proves to be of little benefit and greatly burdens the patient." President's Commission 75. A New Jersey court recognized that families as well as doctors might be discouraged by an inability to stop life-support measures from "even attempting certain types of care [which] could thereby force them into hasty and premature decisions to allow a patient to die." *In re Conroy*, 98 N. J. 321, 370, 486 A. 2d 1209, 1234 (1985). See also Brief for American Academy of Neurology as *Amicus Curiae* 9 (expressing same concern).[15]

---

[15] In any event, the state interest identified by the Missouri Supreme Court—a comprehensive and "unqualified" interest in preserving life, *id.*, at 420, 424—is not even well supported by that State's own enactments. In the first place, Missouri has no law requiring every person to procure any needed medical care nor a state health insurance program to underwrite such care. *Id.*, at 429 (Blackmar, J., dissenting). Second, as the state court admitted, Missouri has a living will statute which specifically "allows and encourages the pre-planned termination of life." *Ibid.;* see Mo. Rev. Stat. § 459.015(1) (1986). The fact that Missouri actively pro-

## III

This is not to say that the State has no legitimate interests to assert here. As the majority recognizes, *ante*, at 281–282, Missouri has a *parens patriae* interest in providing Nancy Cruzan, now incompetent, with as accurate as possible a determination of how she would exercise her rights under these circumstances. Second, if and when it is determined that Nancy Cruzan would want to continue treatment, the State may legitimately assert an interest in providing that treatment. But *until* Nancy's wishes have been deter-

---

vides for its citizens to choose a natural death under certain circumstances suggests that the State's interest in life is not so unqualified as the court below suggests. It is true that this particular statute does not apply to nonterminal patients and does not include artificial nutrition and hydration as one of the measures that may be declined. Nonetheless, Missouri has also not chosen to require court review of every decision to withhold or withdraw life support made on behalf of an incompetent patient. Such decisions are made every day, without state participation. See 760 S. W. 2d, at 428 (Blackmar, J., dissenting).

In addition, precisely what implication can be drawn from the statute's limitations is unclear given the inclusion of a series of "interpretive" provisions in the Act. The first such provision explains that the Act is to be interpreted consistently with the following: "Each person has the primary right to request or refuse medical treatment subject to the state's interest in protecting innocent third parties, preventing homicide and suicide and preserving good ethical standards in the medical profession." Mo. Rev. Stat. § 459.055(1) (1986). The second of these subsections explains that the Act's provisions are cumulative and not intended to increase or decrease the right of a patient to make decisions or lawfully effect the withholding or withdrawal of medical care. § 459.055(2). The third subsection provides that "no presumption concerning the intention of an individual who has not executed a declaration to consent to the use or withholding of medical procedures" shall be created. § 459.055(3).

Thus, even if it were conceivable that a State could assert an interest sufficiently compelling to overcome Nancy Cruzan's constitutional right, Missouri law demonstrates a more modest interest at best. See generally *Capital Cities Cable, Inc.* v. *Crisp*, 467 U. S. 691, 715 (1984) (finding that state regulations narrow in scope indicated that State had only a moderate interest in its professed goal).

mined, the only state interest that may be asserted is an interest in safeguarding the accuracy of that determination.

Accuracy, therefore, must be our touchstone. Missouri may constitutionally impose only those procedural requirements that serve to enhance the accuracy of a determination of Nancy Cruzan's wishes or are at least consistent with an accurate determination. The Missouri "safeguard" that the Court upholds today does not meet that standard. The determination needed in this context is whether the incompetent person would choose to live in a persistent vegetative state on life support or to avoid this medical treatment. Missouri's rule of decision imposes a markedly asymmetrical evidentiary burden. Only evidence of specific statements of treatment choice made by the patient when competent is admissible to support a finding that the patient, now in a persistent vegetative state, would wish to avoid further medical treatment. Moreover, this evidence must be clear and convincing. No proof is required to support a finding that the incompetent person would wish to continue treatment.

## A

The majority offers several justifications for Missouri's heightened evidentiary standard. First, the majority explains that the State may constitutionally adopt this rule to govern determinations of an incompetent's wishes in order to advance the State's substantive interests, including its unqualified interest in the preservation of human life. See *ante*, at 282–283, and n. 10. Missouri's evidentiary standard, however, cannot rest on the State's own interest in a particular substantive result. To be sure, courts have long erected clear and convincing evidence standards to place the greater risk of erroneous decisions on those bringing disfavored claims.[16] In such cases, however, the choice to discourage

---

[16] See *Colorado* v. *New Mexico*, 467 U. S. 310 (1984) (requiring clear and convincing evidence before one State is permitted to divert water from another to accommodate society's interests in stabile property rights and effi-

certain claims was a legitimate, constitutional policy choice. In contrast, Missouri has no such power to disfavor a choice by Nancy Cruzan to avoid medical treatment, because Missouri has no legitimate interest in providing Nancy with treatment until it is established that this represents her choice. See *supra*, at 312–314. Just as a State may not override Nancy's choice directly, it may not do so indirectly through the imposition of a procedural rule.

Second, the majority offers two explanations for why Missouri's clear and convincing evidence standard is a means of enhancing accuracy, but neither is persuasive. The majority initially argues that a clear and convincing evidence standard is necessary to compensate for the possibility that such proceedings will lack the "guarantee of accurate factfinding that the adversary process brings with it," citing *Ohio* v. *Akron Center for Reproductive Health, post*, at 515–516 (upholding a clear and convincing evidence standard for an *ex parte* proceeding). *Ante*, at 281–282. Without supporting the Court's decision in that case, I note that the proceeding to determine an incompetent's wishes is quite different from a proceeding to determine whether a minor may bypass notifying her parents before undergoing an abortion on the ground that she is mature enough to make the decision or that the abortion is in her best interests.

---

cient use of resources); *New York* v. *New Jersey*, 256 U. S. 296 (1921) (promoting federalism by requiring clear and convincing evidence before using Court's power to control the conduct of one State at the behest of another); *Maxwell Land-Grant Case*, 121 U. S. 325 (1887) (requiring clear, unequivocal, and convincing evidence to set aside, annul, or correct a patent or other title to property issued by the Government in order to secure settled expectations concerning property rights); *Marcum* v. *Zaring*, 406 P. 2d 970 (Okla. 1965) (promoting stability of marriage by requiring clear and convincing evidence to prove its invalidity); *Stevenson* v. *Stein*, 412 Pa. 478, 195 A. 2d 268 (1963) (promoting settled expectations concerning property rights by requiring clear and convincing evidence to prove adverse possession).

An adversarial proceeding is of particular importance when one side has a strong personal interest which needs to be counterbalanced to assure the court that the questions will be fully explored. A minor who has a strong interest in obtaining permission for an abortion without notifying her parents may come forward whether or not society would be satisfied that she has made the decision with the seasoned judgment of an adult. The proceeding here is of a different nature. Barring venal motives, which a trial court has the means of ferreting out, the decision to come forward to request a judicial order to stop treatment represents a slowly and carefully considered resolution by at least one adult and more frequently several adults that discontinuation of treatment is the patient's wish.

In addition, the bypass procedure at issue in *Akron, supra,* is *ex parte* and secret. The court may not notify the minor's parents, siblings, or friends. No one may be present to submit evidence unless brought forward by the minor herself. In contrast, the proceeding to determine Nancy Cruzan's wishes was neither *ex parte* nor secret. In a hearing to determine the treatment preferences of an incompetent person, a court is not limited to adjusting burdens of proof as its only means of protecting against a possible imbalance. Indeed, any concern that those who come forward will present a one-sided view would be better addressed by appointing a guardian ad litem, who could use the State's powers of discovery to gather and present evidence regarding the patient's wishes. A guardian ad litem's task is to uncover any conflicts of interest and ensure that each party likely to have relevant evidence is consulted and brought forward—for example, other members of the family, friends, clergy, and doctors. See, *e. g., In re Colyer,* 99 Wash. 2d 114, 133, 660 P. 2d 738, 748–749 (1983). Missouri's heightened evidentiary standard attempts to achieve balance by discounting evidence; the guardian ad litem technique achieves balance by probing for additional evidence. Where, as here, the family members,

friends, doctors, and guardian ad litem agree, it is not because the process has failed, as the majority suggests. See *ante*, at 281, n. 9. It is because there is no genuine dispute as to Nancy's preference.

The majority next argues that where, as here, important individual rights are at stake, a clear and convincing evidence standard has long been held to be an appropriate means of enhancing accuracy, citing decisions concerning what process an individual is due before he can be deprived of a liberty interest. See *ante*, at 283. In those cases, however, this Court imposed a clear and convincing standard as a constitutional minimum on the basis of its evaluation that one side's interests clearly outweighed the second side's interests and therefore the second side should bear the risk of error. See *Santosky* v. *Kramer*, 455 U. S. 745, 753, 766–767 (1982) (requiring a clear and convincing evidence standard for termination of parental rights because the parent's interest is fundamental but the State has no legitimate interest in termination unless the parent is unfit, and finding that the State's interest in finding the best home for the child does not arise until the parent has been found unfit); *Addington* v. *Texas*, 441 U. S. 418, 426–427 (1979) (requiring clear and convincing evidence in an involuntary commitment hearing because the interest of the individual far outweighs that of a State, which has no legitimate interest in confining individuals who are not mentally ill and do not pose a danger to themselves or others). Moreover, we have always recognized that shifting the risk of error reduces the likelihood of errors in one direction at the cost of increasing the likelihood of errors in the other. See *Addington, supra,* at 423 (contrasting heightened standards of proof to a preponderance standard in which the two sides "share the risk of error in roughly equal fashion" because society does not favor one outcome over the other). In the cases cited by the majority, the imbalance imposed by a heightened evidentiary standard was not only acceptable but required because the standard was deployed to protect an in-

dividual's exercise of a fundamental right, as the majority admits, *ante*, at 282–283, n. 10. In contrast, the Missouri court imposed a clear and convincing evidence standard as an obstacle to the exercise of a fundamental right.

The majority claims that the allocation of the risk of error is justified because it is more important not to terminate life support for someone who would wish it continued than to honor the wishes of someone who would not. An erroneous decision to terminate life support is irrevocable, says the majority, while an erroneous decision not to terminate "results in a maintenance of the status quo." See *ante*, at 283.[17] But, from the point of view of the patient, an erroneous decision in either direction is irrevocable. An erroneous decision to terminate artificial nutrition and hydration, to be sure, will lead to failure of that last remnant of physiological life, the brain stem, and result in complete brain death. An erroneous decision not to terminate life support, however, robs a patient of the very qualities protected by the right to avoid unwanted medical treatment. His own degraded existence is perpetuated; his family's suffering is protracted; the memory he leaves behind becomes more and more distorted.

Even a later decision to grant him his wish cannot undo the intervening harm. But a later decision is unlikely in any event. "[T]he discovery of new evidence," to which the ma-

---

[17] The majority's definition of the "status quo," of course, begs the question. Artificial delivery of nutrition and hydration represents the "status quo" only if the State has chosen to permit doctors and hospitals to keep a patient on life-support systems over the protests of his family or guardian. The "status quo" absent that state interference would be the natural result of his accident or illness (and the family's decision). The majority's definition of status quo, however, is "to a large extent a predictable, yet accidental confluence of technology, psyche, and inertia. The general citizenry . . . never said that it favored the creation of coma wards where permanently unconscious patients would be tended for years and years. Nor did the populace as a whole authorize the preeminence of doctors over families in making treatment decisions for incompetent patients." Rhoden, Litigating Life and Death, 102 Harv. L. Rev. 375, 433–434 (1988).

jority refers, *ibid.*, is more hypothetical than plausible. The majority also misconceives the relevance of the possibility of "advancements in medical science," *ibid.*, by treating it as a reason to force someone to continue medical treatment against his will. The possibility of a medical miracle is indeed part of the calculus, but it is a part of the *patient's* calculus. If current research suggests that some hope for cure or even moderate improvement is possible within the lifespan projected, this is a factor that should be and would be accorded significant weight in assessing what the patient himself would choose.[18]

B

Even more than its heightened evidentiary standard, the Missouri court's categorical exclusion of relevant evidence dispenses with any semblance of accurate factfinding. The court adverted to no evidence supporting its decision, but held that no clear and convincing, inherently reliable evidence had been presented to show that Nancy would want to avoid further treatment. In doing so, the court failed to consider statements Nancy had made to family members and a close friend.[19] The court also failed to consider testimony

[18] For Nancy Cruzan, no such cure or improvement is in view. So much of her brain has deteriorated and been replaced by fluid, see App. to Pet. for Cert. A94, that apparently the only medical advance that could restore consciousness to her body would be a brain transplant. Cf. n. 22, *infra.*

[19] The trial court had relied on the testimony of Athena Comer, a longtime friend, co-worker, and housemate for several months, as sufficient to show that Nancy Cruzan would wish to be free of medical treatment under her present circumstances. App. to Pet. for Cert. A94. Ms. Comer described a conversation she and Nancy had while living together, concerning Ms. Comer's sister who had become ill suddenly and died during the night. The Comer family had been told that if she had lived through the night, she would have been in a vegetative state. Nancy had lost a grandmother a few months before. Ms. Comer testified: "Nancy said she would never want to live [in a vegetative state] because if she couldn't be normal or even, you know, like half way, and do things for yourself, because Nancy always did, that she didn't want to live . . . and we talked about it a lot." Tr. 388–389. She said "several times" that "she wouldn't want to

from Nancy's mother and sister that they were certain that Nancy would want to discontinue artificial nutrition and hydration,[20] even after the court found that Nancy's family was loving and without malignant motive. See 760 S. W. 2d, at 412. The court also failed to consider the conclusions of the guardian ad litem, appointed by the trial court, that there was clear and convincing evidence that Nancy would want to

---

live that way because if she was going to live, she wanted to be able to live, not to just lay in a bed and not be able to move because you can't do anything for yourself." *Id.*, at 390, 396. "[S]he said that she hoped that [all the] people in her family knew that she wouldn't want to live [in a vegetative state] because she knew it was usually up to the family whether you lived that way or not." *Id.*, at 399.

The conversation took place approximately a year before Nancy's accident and was described by Ms. Comer as a "very serious" conversation that continued for approximately half an hour without interruption. *Id.*, at 390. The Missouri Supreme Court dismissed Nancy's statement as "unreliable" on the ground that it was an informally expressed reaction to other people's medical conditions. 760 S. W. 2d, at 424.

The Missouri Supreme Court did not refer to other evidence of Nancy's wishes or explain why it was rejected. Nancy's sister Christy, to whom she was very close, testified that she and Nancy had had two very serious conversations about a year and a half before the accident. A day or two after their niece was stillborn (but would have been badly damaged if she had lived), Nancy had said that maybe it was part of a "greater plan" that the baby had been stillborn and did not have to face "the possible life of mere existence." Tr. 537. A month later, after their grandmother had died after a long battle with heart problems, Nancy said that "it was better for my grandmother not to be kind of brought back and forth [by] medical [treatment], brought back from a critical near point of death . . . ." *Id.*, at 541.

[20] Nancy's sister Christy, Nancy's mother, and another of Nancy's friends testified that Nancy would want to discontinue the hydration and nutrition. Christy said that "Nancy would be horrified at the state she is in." *Id.*, at 535. She would also "want to take that burden away from [her family]." *Id.*, at 544. Based on "a lifetime of experience [I know Nancy's wishes] are to discontinue the hydration and the nutrition." *Id.*, at 542. Nancy's mother testified: "Nancy would not want to be like she is now. [I]f it were me up there or Christy or any of us, she would be doing for us what we are trying to do for her. I know she would, . . . as her mother." *Id.*, at 526.

discontinue medical treatment and that this was in her best interests. *Id.*, at 444 (Higgins, J., dissenting from denial of rehearing); Brief for Respondent Guardian Ad Litem 2–3. The court did not specifically define what kind of evidence it would consider clear and convincing, but its general discussion suggests that only a living will or equivalently formal directive from the patient when competent would meet this standard. See 760 S. W. 2d, at 424–425.

Too few people execute living wills or equivalently formal directives for such an evidentiary rule to ensure adequately that the wishes of incompetent persons will be honored.[21] While it might be a wise social policy to encourage people to furnish such instructions, no general conclusion about a patient's choice can be drawn from the absence of formalities. The probability of becoming irreversibly vegetative is so low that many people may not feel an urgency to marshal formal evidence of their preferences. Some may not wish to dwell on their own physical deterioration and mortality. Even someone with a resolute determination to avoid life support under circumstances such as Nancy's would still need to know that such things as living wills exist and how to execute one. Often legal help would be necessary, especially given the majority's apparent willingness to permit States to insist that a person's wishes are not truly known unless the particular medical treatment is specified. See *ante*, at 285.

---

[21] Surveys show that the overwhelming majority of Americans have not executed such written instructions. See Emmanuel & Emmanuel, The Medical Directive: A New Comprehensive Advance Care Document, 261 JAMA 3288 (1989) (only 9% of Americans execute advance directives about how they would wish treatment decisions to be handled if they became incompetent); American Medical Association Surveys of Physician and Public Opinion on Health Care Issues 29–30 (1988) (only 15% of those surveyed had executed living wills); 2 President's Commission for the Study of Ethical Problems in Medicine and Biomedical and Behavioral Research, Making Health Care Decisions 241–242 (1982) (23% of those surveyed said that they had put treatment instructions in writing).

As a California appellate court observed: "The lack of generalized public awareness of the statutory scheme and the typically human characteristics of procrastination and reluctance to contemplate the need for such arrangements however makes this a tool which will all too often go unused by those who might desire it." *Barber* v. *Superior Court*, 147 Cal. App. 3d 1006, 1015, 195 Cal. Rptr. 484, 489 (1983). When a person tells family or close friends that she does not want her life sustained artificially, she is "express[ing] her wishes in the only terms familiar to her, and . . . as clearly as a lay person should be asked to express them. To require more is unrealistic, and for all practical purposes, it precludes the right of patients to forego life-sustaining treatment." *In re O'Connor*, 72 N. Y. 2d 517, 551, 531 N. E. 2d 607, 626 (1988) (Simons, J., dissenting).[22] When Missouri enacted a living will statute, it specifically provided that the absence of a living will does not warrant a presumption that a patient wishes continued medical treatment. See n. 15, *supra*.

---

[22] New York is the only State besides Missouri to deny a request to terminate life support on the ground that clear and convincing evidence of prior, expressed intent was absent, although New York did so in the context of very different situations. Mrs. O'Connor, the subject of *In re O'Connor*, had several times expressed her desire not to be placed on life support if she were not going to be able to care for herself. However, both of her daughters testified that they did not know whether their mother would want to decline artificial nutrition and hydration under her present circumstances. Cf. n. 13, *supra*. Moreover, despite damage from several strokes, Mrs. O'Connor was conscious and capable of responding to simple questions and requests and the medical testimony suggested she might improve to some extent. Cf. *supra*, at 301. The New York Court of Appeals also denied permission to terminate blood transfusions for a severely retarded man with terminal cancer because there was no evidence of a treatment choice made by the man when competent, as he had never been competent. See *In re Storar*, 52 N. Y. 2d 363, 420 N. E. 2d 64, cert. denied, 454 U. S. 858 (1981). Again, the court relied on evidence that the man was conscious, functioning in the way he always had, and that the transfusions did not cause him substantial pain (although it was clear he did not like them).

Thus, apparently not even Missouri's own legislature believes that a person who does not execute a living will fails to do so because he wishes continuous medical treatment under all circumstances.

The testimony of close friends and family members, on the other hand, may often be the best evidence available of what the patient's choice would be. It is they with whom the patient most likely will have discussed such questions and they who know the patient best. "Family members have a unique knowledge of the patient which is vital to any decision on his or her behalf." Newman, Treatment Refusals for the Critically and Terminally Ill: Proposed Rules for the Family, the Physician, and the State, 3 N. Y. L. S. Human Rights Annual 35, 46 (1985). The Missouri court's decision to ignore this whole category of testimony is also at odds with the practices of other States. See, *e. g., In re Peter*, 108 N. J. 365, 529 A. 2d 419 (1987); *Brophy* v. *New England Sinai Hospital, Inc.*, 398 Mass. 417, 497 N. E. 2d 626 (1986); *In re Severns*, 425 A. 2d 156 (Del. Ch. 1980).

The Missouri court's disdain for Nancy's statements in serious conversations not long before her accident, for the opinions of Nancy's family and friends as to her values, beliefs and certain choice, and even for the opinion of an outside objective factfinder appointed by the State evinces a disdain for Nancy Cruzan's own right to choose. The rules by which an incompetent person's wishes are determined must represent every effort to determine those wishes. The rule that the Missouri court adopted and that this Court upholds, however, skews the result away from a determination that as accurately as possible reflects the individual's own preferences and beliefs. It is a rule that transforms human beings into passive subjects of medical technology.

> "[M]edical care decisions must be guided by the individual patient's interests and values. Allowing persons to determine their own medical treatment is an important way in which society respects persons as individuals.

Moreover, the respect due to persons as individuals does not diminish simply because they have become incapable of participating in treatment decisions. . . . [I]t is still possible for others to make a decision that reflects [the patient's] interests more closely than would a purely technological decision to do whatever is possible. Lacking the ability to decide, [a patient] has a right to a decision that takes his interests into account." *Conservatorship of Drabick*, 200 Cal. App. 3d 185, 208, 245 Cal. Rptr. 840, 854–855, cert. denied, 488 U. S. 958 (1988).

C

I do not suggest that States must sit by helplessly if the choices of incompetent patients are in danger of being ignored. See *ante*, at 281. Even if the Court had ruled that Missouri's rule of decision is unconstitutional, as I believe it should have, States would nevertheless remain free to fashion procedural protections to safeguard the interests of incompetents under these circumstances. The Constitution provides merely a framework here: Protections must be genuinely aimed at ensuring decisions commensurate with the will of the patient, and must be reliable as instruments to that end. Of the many States which have instituted such protections, Missouri is virtually the only one to have fashioned a rule that lessens the likelihood of accurate determinations. In contrast, nothing in the Constitution prevents States from reviewing the advisability of a family decision, by requiring a court proceeding or by appointing an impartial guardian ad litem.

There are various approaches to determining an incompetent patient's treatment choice in use by the several States today, and there may be advantages and disadvantages to each and other approaches not yet envisioned. The choice, in largest part, is and should be left to the States, so long as each State is seeking, in a reliable manner, to discover what the patient would want. But with such momentous interests in the balance, States must avoid procedures that will preju-

dice the decision. "To err either way—to keep a person alive under circumstances under which he would rather have been allowed to die, or to allow that person to die when he would have chosen to cling to life—would be deeply unfortunate." *In re Conroy*, 98 N. J., at 343, 486 A. 2d, at 1220.

## D

Finally, I cannot agree with the majority that where it is not possible to determine what choice an incompetent patient would make, a State's role as *parens patriae* permits the State automatically to make that choice itself. See *ante*, at 286 (explaining that the Due Process Clause does not require a State to confide the decision to "anyone but the patient herself"). Under fair rules of evidence, it is improbable that a court could not determine what the patient's choice would be. Under the rule of decision adopted by Missouri and upheld today by this Court, such occasions might be numerous. But in neither case does it follow that it is constitutionally acceptable for the State invariably to assume the role of deciding for the patient. A State's legitimate interest in safeguarding a patient's choice cannot be furthered by simply appropriating it.

The majority justifies its position by arguing that, while close family members may have a strong feeling about the question, "there is no automatic assurance that the view of close family members will necessarily be the same as the patient's would have been had she been confronted with the prospect of her situation while competent." *Ibid.* I cannot quarrel with this observation. But it leads only to another question: Is there any reason to suppose that a State is *more* likely to make the choice that the patient would have made than someone who knew the patient intimately? To ask this is to answer it. As the New Jersey Supreme Court observed: "Family members are best qualified to make substituted judgments for incompetent patients not only because of their peculiar grasp of the patient's approach to life, but also

because of their special bonds with him or her. . . . It is . . . they who treat the patient as a person, rather than a symbol of a cause." *In re Jobes*, 108 N. J. 394, 416, 529 A. 2d 434, 445 (1987). The State, in contrast, is a stranger to the patient.

A State's inability to discern an incompetent patient's choice still need not mean that a State is rendered powerless to protect that choice. But I would find that the Due Process Clause prohibits a State from doing more than that. A State may ensure that the person who makes the decision on the patient's behalf is the one whom the patient himself would have selected to make that choice for him. And a State may exclude from consideration anyone having improper motives. But a State generally must either repose the choice with the person whom the patient himself would most likely have chosen as proxy or leave the decision to the patient's family.[23]

## IV

As many as 10,000 patients are being maintained in persistent vegetative states in the United States, and the number is expected to increase significantly in the near future. See Cranford, *supra* n. 2, at 27, 31. Medical technology, developed over the past 20 or so years, is often capable of resuscitating people after they have stopped breathing or their hearts have stopped beating. Some of those people are brought fully back to life. Two decades ago, those who were not and could not swallow and digest food, died. Intravenous solutions could not provide sufficient calories to maintain people for more than a short time. Today, various forms of artificial feeding have been developed that are able to keep people metabolically alive for years, even decades. See Spencer & Palmisano, Specialized Nutritional Support of

---

[23] Only in the exceedingly rare case where the State cannot find any family member or friend who can be trusted to endeavor genuinely to make the treatment choice the patient would have made does the State become the legitimate surrogate decisionmaker.

Patients—A Hospital's Legal Duty?, 11 Quality Rev. Bull. 160, 160–161 (1985). In addition, in this century, chronic or degenerative ailments have replaced communicable diseases as the primary causes of death. See R. Weir, Abating Treatment with Critically Ill Patients 12–13 (1989); President's Commission 15–16. The 80% of Americans who die in hospitals are "likely to meet their end . . . 'in a sedated or comatose state; betubed nasally, abdominally and intravenously; and far more like manipulated objects than like moral subjects.'"[24] A fifth of all adults surviving to age 80 will suffer a progressive dementing disorder prior to death. See Cohen & Eisdorfer, Dementing Disorders, in The Practice of Geriatrics 194 (E. Calkins, P. Davis, & A. Ford eds. 1986).

"[L]aw, equity and justice must not themselves quail and be helpless in the face of modern technological marvels presenting questions hitherto unthought of." *In re Quinlan*, 70 N. J. 10, 44, 355 A. 2d 647, 665, cert. denied, 429 U. S. 922 (1976). The new medical technology can reclaim those who would have been irretrievably lost a few decades ago and restore them to active lives. For Nancy Cruzan, it failed, and for others with wasting incurable disease, it may be doomed to failure. In these unfortunate situations, the bodies and preferences and memories of the victims do not escheat to the State; nor does our Constitution permit the State or any other government to commandeer them. No singularity of feeling exists upon which such a government might confidently rely as *parens patriae*. The President's Commission, after years of research, concluded:

> "In few areas of health care are people's evaluations of their experiences so varied and uniquely personal as in their assessments of the nature and value of the processes associated with dying. For some, every moment of life is of inestimable value; for others, life without

---

[24] Fadiman, The Liberation of Lolly and Gronky, Life Magazine, Dec. 1986, p. 72 (quoting medical ethicist Joseph Fletcher).

some desired level of mental or physical ability is worthless or burdensome. A moderate degree of suffering may be an important means of personal growth and religious experience to one person, but only frightening or despicable to another." President's Commission 276.

Yet Missouri and this Court have displaced Nancy's own assessment of the processes associated with dying. They have discarded evidence of her will, ignored her values, and deprived her of the right to a decision as closely approximating her own choice as humanly possible. They have done so disingenuously in her name and openly in Missouri's own. That Missouri and this Court may truly be motivated only by concern for incompetent patients makes no matter. As one of our most prominent jurists warned us decades ago: "Experience should teach us to be most on our guard to protect liberty when the government's purposes are beneficent. . . . The greatest dangers to liberty lurk in insidious encroachment by men of zeal, well meaning but without understanding." *Olmstead* v. *United States*, 277 U. S. 438, 479 (1928) (Brandeis, J., dissenting).

I respectfully dissent.

JUSTICE STEVENS, dissenting.

Our Constitution is born of the proposition that all legitimate governments must secure the equal right of every person to "Life, Liberty, and the pursuit of Happiness."[1] In the ordinary case we quite naturally assume that these three

---

[1] It is stated in the Declaration of Independence that:

"We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty and the pursuit of Happiness. That to secure these rights, Governments are instituted among Men, deriving their just powers from the consent of the governed,—That whenever any Form of Government becomes destructive of these ends, it is the Right of the People to alter or to abolish it, and to institute new Government, laying its foundation on such principles and organizing its powers in such form, as to them shall seem most likely to effect their Safety and Happiness."

ends are compatible, mutually enhancing, and perhaps even coincident.

The Court would make an exception here. It permits the State's abstract, undifferentiated interest in the preservation of life to overwhelm the best interests of Nancy Beth Cruzan, interests which would, according to an undisputed finding, be served by allowing her guardians to exercise her constitutional right to discontinue medical treatment. Ironically, the Court reaches this conclusion despite endorsing three significant propositions which should save it from any such dilemma. First, a competent individual's decision to refuse life-sustaining medical procedures is an aspect of liberty protected by the Due Process Clause of the Fourteenth Amendment. See *ante*, at 278–279. Second, upon a proper evidentiary showing, a qualified guardian may make that decision on behalf of an incompetent ward. See, *e. g.*, *ante*, at 284–285. Third, in answering the important question presented by this tragic case, it is wise "'not to attempt, by any general statement, to cover every possible phase of the subject.'" See *ante*, at 278 (citation omitted). Together, these considerations suggest that Nancy Cruzan's liberty to be free from medical treatment must be understood in light of the facts and circumstances particular to her.

I would so hold: In my view, the Constitution requires the State to care for Nancy Cruzan's life in a way that gives appropriate respect to her own best interests.

## I

This case is the first in which we consider whether, and how, the Constitution protects the liberty of seriously ill patients to be free from life-sustaining medical treatment. So put, the question is both general and profound. We need not, however, resolve the question in the abstract. Our responsibility as judges both enables and compels us to treat the problem as it is illuminated by the facts of the controversy before us.

The most important of those facts are these: "Clear and convincing evidence" established that Nancy Cruzan is "oblivious to her environment except for reflexive responses to sound and perhaps to painful stimuli"; that "she has no cognitive or reflexive ability to swallow food or water"; that "she will never recover" these abilities; and that her "cerebral cortical atrophy is irreversible, permanent, progressive and ongoing." App. to Pet. for Cert. A94–A95. Recovery and consciousness are impossible; the highest cognitive brain function that can be hoped for is a grimace in "recognition of ordinarily painful stimuli" or an "apparent response to sound." *Id.*, at A95.[2]

After thus evaluating Nancy Cruzan's medical condition, the trial judge next examined how the interests of third parties would be affected if Nancy's parents were allowed to withdraw the gastrostomy tube that had been implanted in

---

[2] The trial court found as follows on the basis of "clear and convincing evidence":

"1. That her respiration and circulation are not artificially maintained and within essentially normal limits for a 30 year old female with vital signs recently reported as BP 130/80; pulse 78 and regular; respiration spontaneous at 16 to 18 per minute.

"2. That she is oblivious to her environment except for reflexive responses to sound and perhaps to painful stimuli.

"3. That she has suffered anoxia of the brain resulting in massive enlargement of the ventricles filling with cerebrospinal fluid in the area where the brain has degenerated. This cerebral cortical atrophy is irreversible, permanent, progressive and ongoing.

"4. That her highest cognitive brain function is exhibited by her grimacing perhaps in recognition of ordinarily painful stimuli, indicating the experience of pain and her apparent response to sound.

"5. That she is spastic quadriplegic.

"6. That she has contractures of her four extremities which are slowly progressive with irreversible muscular and tendon damage to all extremities.

"7. That she has no cognitive or reflexive ability to swallow food or water to maintain her daily essential needs. That she will never recover her ability to swallow sufficient to satisfy her needs." App. to Pet. for Cert. A94–A95.

their daughter. His findings make it clear that the parents' request had no economic motivation,[3] and that granting their request would neither adversely affect any innocent third parties nor breach the ethical standards of the medical profession.[4] He then considered, and rejected, a religious objection to his decision,[5] and explained why he concluded that the ward's constitutional "right to liberty" outweighed the general public policy on which the State relied:

> "There is a fundamental natural right expressed in our Constitution as the 'right to liberty,' which permits an individual to refuse or direct the withholding or withdrawal of artificial death prolonging procedures when the person has no more cognitive brain function than our Ward and all the physicians agree there is no hope of further recovery while the deterioration of the brain continues with further overall worsening physical contractures. To the extent that the statute or public policy prohibits withholding or withdrawal of nutrition and hydration or euthanasia or mercy killing, if such be the definition, under all circumstances, arbitrarily and with no exceptions, it is in violation of our ward's constitutional rights by depriving her of liberty without due process of

---

[3] "The only economic considerations in this case rest with Respondent's employer, the State of Missouri, which is bearing the entire cost of care. Our ward is an adult without financial resources other than Social Security whose not inconsiderable medical insurance has been exhausted since January 1986." *Id.*, at A96.

[4] "In this case there are no innocent third parties requiring state protection, neither homicide nor suicide will be committed and the consensus of the medical witnesses indicated concerns personal to themselves or the legal consequences of such actions rather than any objections that good ethical standards of the profession would be breached if the nutrition and hydration were withdrawn the same as any other artificial death prolonging procedures the statute specifically authorizes." *Id.*, at A98.

[5] "Nancy's present unresponsive and hopeless existence is not the will of the Supreme Ruler but of man's will to forcefully feed her when she herself cannot swallow thus fueling respiratory and circulatory pumps to no cognitive purpose for her except sound and perhaps pain." *Id.*, at A97.

law.   To decide otherwise that medical treatment once undertaken must be continued irrespective of its lack of success or benefit to the patient in effect gives one's body to medical science without their *[sic]* consent.

.          .          .          .          .

"The Co-guardians are required only to exercise their legal authority to act in the best interests of their Ward as they discharge their duty and are free to act or not with this authority as they may determine." *Id.*, at A98–A99 (footnotes omitted).

## II

Because he believed he had a duty to do so, the independent guardian ad litem appealed the trial court's order to the Missouri Supreme Court.   In that appeal, however, the guardian advised the court that he did not disagree with the trial court's decision.   Specifically, he endorsed the critical finding that "it was in Nancy Cruzan's best interests to have the tube feeding discontinued."[6]

That important conclusion thus was not disputed by the litigants.   One might reasonably suppose that it would be dispositive: If Nancy Cruzan has no interest in continued treatment, and if she has a liberty interest in being free from unwanted treatment, and if the cessation of treatment would have no adverse impact on third parties, and if no reason exists to doubt the good faith of Nancy's parents, then what possible basis could the State have for insisting upon continued medical treatment?   Yet, instead of questioning or endorsing the trial court's conclusions about Nancy Cruzan's interests, the State Supreme Court largely ignored them.

---

[6] "Appellant guardian ad litem advises this court:

"'we informed the [trial] court that we felt it was in Nancy Cruzan's best interests to have the tube feeding discontinued.   We now find ourselves in the position of appealing from a judgment we basically agree with.'" *Cruzan* v. *Harmon*, 760 S. W. 2d 408, 435 (Mo. 1988) (Higgins, J., dissenting).

The opinion of that court referred to four different state interests that have been identified in other somewhat similar cases, but acknowledged that only the State's general interest in "the preservation of life" was implicated by this case.[7] It defined that interest as follows:

> "The state's interest in life embraces two separate concerns: an interest in the prolongation of the life of the individual patient and an interest in the sanctity of life itself." *Cruzan* v. *Harmon*, 760 S. W. 2d 408, 419 (1988).

Although the court did not characterize this interest as absolute, it repeatedly indicated that it outweighs any countervailing interest that is based on the "quality of life" of any individual patient.[8] In the view of the state-court majority,

---

[7] "Four state interests have been identified: preservation of life, prevention of homicide and suicide, the protection of interests of innocent third parties and the maintenance of the ethical integrity of the medical profession. *See* Section 459.055(1), RSMo 1986; *Brophy*, 497 N. E. 2d at 634. In this case, only the state's interest in the preservation of life is implicated." *Id.*, at 419.

[8] "The state's concern with the sanctity of life rests on the principle that life is precious and worthy of preservation without regard to its quality." *Ibid.*

"It is tempting to equate the state's interest in the preservation of life with some measure of quality of life. As the discussion which follows shows, some courts find quality of life a convenient focus when justifying the termination of treatment. But the state's interest is not in quality of life. The broad policy statements of the legislature make no such distinction; nor shall we. Were quality of life at issue, persons with all manner of handicaps might find the state seeking to terminate their lives. Instead, the state's interest is in life; that interest is unqualified." *Id.*, at 420.

"As we previously stated, however, the state's interest is not in quality of life. The state's interest is an unqualified interest in life." *Id.*, at 422. "The argument made here, that Nancy will not recover, is but a thinly veiled statement that her life in its present form is not worth living. Yet a diminished quality of life does not support a decision to cause death." *Ibid.*

"Given the fact that Nancy is alive and that the burdens of her treatment are not excessive for her, we do not believe her right to refuse treatment, whether that right proceeds from a constitutional right of privacy or a com-

that general interest is strong enough to foreclose any decision to refuse treatment for an incompetent person unless that person had previously evidenced, in a clear and convincing terms, such a decision for herself. The best interests of the incompetent individual who had never confronted the issue—or perhaps had been incompetent since birth—are entirely irrelevant and unprotected under the reasoning of the State Supreme Court's four-judge majority.

The three dissenting judges found Nancy Cruzan's interests compelling. They agreed with the trial court's evaluation of state policy. In his persuasive dissent, Judge Blackmar explained that decisions about the care of chronically ill patients were traditionally private:

> "My disagreement with the principal opinion lies fundamentally in its emphasis on the interest of and the role of the state, represented by the Attorney General. Decisions about prolongation of life are of recent origin. For most of the world's history, and presently in most parts of the world, such decisions would never arise because the technology would not be available. Decisions about medical treatment have customarily been made by the patient, or by those closest to the patient if the patient, because of youth or infirmity, is unable to make the decisions. This is nothing new in substituted decisionmaking. The state is seldom called upon to be the decisionmaker.

> "I would not accept the assumption, inherent in the principal opinion, that, with our advanced technology, the state must necessarily become involved in a decision about using extraordinary measures to prolong life. Decisions of this kind are made daily by the patient or relatives, on the basis of medical advice and their conclusion as to what is best. Very few cases reach court, and

mon law right to refuse treatment, outweighs the immense, clear fact of life in which the state maintains a vital interest." *Id.*, at 424.

I doubt whether this case would be before us but for the fact that Nancy lies in a state hospital. I do not place primary emphasis on the patient's expressions, except possibly in the very unusual case, of which I find no example in the books, in which the patient expresses a view that all available life supports should be made use of. Those closest to the patient are best positioned to make judgments about the patient's best interest." *Id.*, at 428.

Judge Blackmar then argued that Missouri's policy imposed upon dying individuals and their families a controversial and objectionable view of life's meaning:

"It is unrealistic to say that the preservation of life is an absolute, without regard to the quality of life. I make this statement only in the context of a case in which the trial judge has found that there is no chance for amelioration of Nancy's condition. The principal opinion accepts this conclusion. It is appropriate to consider the quality of life in making decisions about the extraordinary medical treatment. Those who have made decisions about such matters without resort to the courts certainly consider the quality of life, and balance this against the unpleasant consequences to the patient. There is evidence that Nancy may react to pain stimuli. If she has any awareness of her surroundings, her life must be a living hell. She is unable to express herself or to do anything at all to alter her situation. Her parents, who are her closest relatives, are best able to feel for her and to decide what is best for her. The state should not substitute its decisions for theirs. Nor am I impressed with the crypto-philosophers cited in the principal opinion, who declaim about the sanctity of any life without regard to its quality. They dwell in ivory towers." *Id.*, at 429.

Finally, Judge Blackmar concluded that the Missouri policy was illegitimate because it treats life as a theoretical abstraction, severed from, and indeed opposed to, the person of Nancy Cruzan.

> "The Cruzan family appropriately came before the court seeking relief. The circuit judge properly found the facts and applied the law. His factual findings are supported by the record and his legal conclusions by overwhelming weight of authority. The principal opinion attempts to establish absolutes, but does so at the expense of human factors. In so doing it unnecessarily subjects Nancy and those close to her to continuous torture which no family should be forced to endure." *Id.*, at 429–430.

Although Judge Blackmar did not frame his argument as such, it propounds a sound constitutional objection to the Missouri majority's reasoning: Missouri's regulation is an unreasonable intrusion upon traditionally private matters encompassed within the liberty protected by the Due Process Clause.

The portion of this Court's opinion that considers the merits of this case is similarly unsatisfactory. It, too, fails to respect the best interests of the patient.[9] It, too, relies on what is tantamount to a waiver rationale: The dying patient's best interests are put to one side, and the entire inquiry is focused on her prior expressions of intent.[10] An innocent person's constitutional right to be free from unwanted medical treatment is thereby categorically limited to those patients who had the foresight to make an unambiguous state-

---

[9] See especially *ante*, at 282 ("[W]e think a State may properly decline to make judgments about the 'quality' of life that a particular individual may enjoy, and simply assert an unqualified interest in the preservation of human life to be weighed against the constitutionally protected interests of the individual"); *ante*, at 282, n. 10 (stating that the government is seeking to protect "its own institutional interests" in life).

[10] See, *e. g., ante*, at 284.

ment of their wishes while competent. The Court's decision affords no protection to children, to young people who are victims of unexpected accidents or illnesses, or to the countless thousands of elderly persons who either fail to decide, or fail to explain, how they want to be treated if they should experience a similar fate. Because Nancy Beth Cruzan did not have the foresight to preserve her constitutional right in a living will, or some comparable "clear and convincing" alternative, her right is gone forever and her fate is in the hands of the state legislature instead of in those of her family, her independent neutral guardian ad litem, and an impartial judge—all of whom agree on the course of action that is in her best interests. The Court's willingness to find a waiver of this constitutional right reveals a distressing misunderstanding of the importance of individual liberty.

## III

It is perhaps predictable that courts might undervalue the liberty at stake here. Because death is so profoundly personal, public reflection upon it is unusual. As this sad case shows, however, such reflection must become more common if we are to deal responsibly with the modern circumstances of death. Medical advances have altered the physiological conditions of death in ways that may be alarming: Highly invasive treatment may perpetuate human existence through a merger of body and machine that some might reasonably regard as an insult to life rather than as its continuation. But those same advances, and the reorganization of medical care accompanying the new science and technology, have also transformed the political and social conditions of death: People are less likely to die at home, and more likely to die in relatively public places, such as hospitals or nursing homes.[11]

---

[11] "Until the latter part of this century, medicine had relatively little treatment to offer the dying and the vast majority of persons died at home rather than in the hospital." Brief for American Medical Association et al. as *Amici Curiae* 6. "In 1985, 83% of deaths [of] Americans age 65 or over occurred in a hospital or nursing home. Sager, Easterling, *et. al.*,

Ultimate questions that might once have been dealt with in intimacy by a family and its physician[12] have now become the concern of institutions. When the institution is a state hos-

---

*Changes in the Location of Death After Passage of Medicare's Prospective Payment System: A National Study*, 320 New Eng. J. Med. 433, 435 (1989)." *Id.*, at 6, n. 2.

According to the President's Commission for the Study of Ethical Problems in Medicine and Biomedical and Behavioral Research:

"Just as recent years have seen alterations in the underlying causes of death, the places where people die have also changed. For most of recorded history, deaths (of natural causes) usually occurred in the home.

"'Everyone knew about death at first hand; there was nothing unfamiliar or even queer about the phenomenon. People seem to have known a lot more about the process itself than is the case today. The "deathbed" was a real place, and the dying person usually knew where he was and when it was time to assemble the family and call for the priest.'

"Even when people did get admitted to a medical care institution, those whose conditions proved incurable were discharged to the care of their families. This was not only because the health care system could no longer be helpful, but also because alcohol and opiates (the only drugs available to ease pain and suffering) were available without a prescription. Institutional care was reserved for the poor or those without family support; hospitals often aimed more at saving patients' souls than at providing medical care.

"As medicine has been able to do more for dying patients, their care has increasingly been delivered in institutional settings. By 1949, institutions were the sites of 50% of all deaths; by 1958, the figure was 61%; and by 1977, over 70%. Perhaps 80% of all deaths in the United States now occur in hospitals and long-term care institutions, such as nursing homes. The change in where very ill patients are treated permits health care professionals to marshall the instruments of scientific medicine more effectively. But people who are dying may well find such a setting alienating and unsupportive." Deciding to Forego Life-Sustaining Treatment 17–18 (1983) (footnotes omitted), quoting Thomas, Dying as Failure, 447 Annals Am. Acad. Pol. & Soc. Sci. 1, 3 (1980).

[12] We have recognized that the special relationship between patient and physician will often be encompassed within the domain of private life protected by the Due Process Clause. See, *e. g.*, *Griswold* v. *Connecticut*, 381 U. S. 479, 481 (1965); *Roe* v. *Wade*, 410 U. S. 113, 152–153 (1973); *Thornburgh* v. *American College of Obstetricians and Gynecologists*, 476 U. S. 747, 759 (1986).

pital, as it is in this case, the government itself becomes involved.[13] Dying nonetheless remains a part of "the life which characteristically has its place in the home," *Poe* v. *Ullman*, 367 U. S. 497, 551 (1961) (Harlan, J., dissenting). The "integrity of that life is something so fundamental that it has been found to draw to its protection the principles of more than one explicitly granted Constitutional right," *id.*, at 551–552, and our decisions have demarcated a "private realm of family life which the state cannot enter." *Prince* v. *Massachusetts*, 321 U. S. 158, 166–167 (1944). The physical boundaries of the home, of course, remain crucial guarantors of the life within it. See, *e. g.*, *Payton* v. *New York*, 445 U. S. 573, 589 (1980); *Stanley* v. *Georgia*, 394 U. S. 557, 565 (1969). Nevertheless, this Court has long recognized that the liberty to make the decisions and choices constitutive of private life is so fundamental to our "concept of ordered liberty," *Palko* v. *Connecticut*, 302 U. S. 319, 325 (1937), that those choices must occasionally be afforded more direct pro-

---

[13] The Court recognizes that "the State has been involved as an adversary from the beginning" in this case only because Nancy Cruzan "was a patient at a state hospital when this litigation commenced," *ante*, at 281, n. 9. It seems to me, however, that the Court draws precisely the wrong conclusion from this insight. The Court apparently believes that the absence of the State from the litigation would have created a problem, because agreement among the family and the independent guardian ad litem as to Nancy Cruzan's best interests might have prevented her treatment from becoming the focus of a "truly adversarial" proceeding. *Ibid.* It may reasonably be debated whether some judicial process should be required before life-sustaining treatment is discontinued; this issue has divided the state courts. Compare *In re Estate of Longeway*, 133 Ill. 2d 33, 51, 549 N. E. 2d 292, 300 (1989) (requiring judicial approval of guardian's decision), with *In re Hamlin*, 102 Wash. 2d 810, 818–819, 689 P. 2d 1372, 1377–1378 (1984) (discussing circumstances in which judicial approval is unnecessary). Cf. *In re Conservatorship of Torres*, 357 N. W. 2d 332, 341, n. 4 (Minn. 1984) ("At oral argument it was disclosed that on an average about 10 life support systems are disconnected weekly in Minnesota"). I tend, however, to agree with Judge Blackmar that the intervention of the State in these proceedings as an *adversary* is not so much a cure as it is part of the disease.

tection. See, *e. g.*, *Meyer* v. *Nebraska*, 262 U. S. 390 (1923); *Griswold* v. *Connecticut*, 381 U. S. 479 (1965); *Roe* v. *Wade*, 410 U. S. 113 (1973); *Thornburgh* v. *American College of Obstetricians and Gynecologists*, 476 U. S. 747, 772–782 (1986) (STEVENS, J., concurring).

Respect for these choices has guided our recognition of rights pertaining to bodily integrity. The constitutional decisions identifying those rights, like the common-law tradition upon which they built,[14] are mindful that the "makers of our Constitution . . . recognized the significance of man's spiritual nature." *Olmstead* v. *United States*, 277 U. S. 438, 478 (1928) (Brandeis, J., dissenting). It may truly be said that "our notions of liberty are inextricably entwined with our idea of physical freedom and self-determination." *Ante*, at 287 (O'CONNOR, J., concurring). Thus we have construed the Due Process Clause to preclude physically invasive recoveries of evidence not only because such procedures are "brutal" but also because they are "offensive to human dignity." *Rochin* v. *California*, 342 U. S. 165, 174 (1952). We have interpreted the Constitution to interpose barriers to a State's efforts to sterilize some criminals not only because the proposed punishment would do "irreparable injury" to bodily integrity, but because "[m]arriage and procreation" concern "the basic civil rights of man." *Skinner* v. *Oklahoma ex rel. Williamson*, 316 U. S. 535, 541 (1942). The sanctity, and individual privacy, of the human body is obviously fundamental to liberty. "Every violation of a person's bodily integrity is an invasion of his or her liberty." *Washington* v. *Harper*, 494 U. S. 210, 237 (1990) (STEVENS, J., concurring in part and dissenting in part). Yet, just as the constitutional protection for the "physical curtilage of the home . . . is surely

---

[14] See *ante*, at 269, 278. "No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." *Union Pacific R. Co.* v. *Botsford*, 141 U. S. 250, 251 (1891).

. . . a result of solicitude to protect the privacies of the life within," *Poe* v. *Ullman*, 367 U. S., at 551 (Harlan, J., dissenting), so too the constitutional protection for the human body is surely inseparable from concern for the mind and spirit that dwell therein.

It is against this background of decisional law, and the constitutional tradition which it illuminates, that the right to be free from unwanted life-sustaining medical treatment must be understood. That right presupposes no abandonment of the desire for life. Nor is it reducible to a protection against batteries undertaken in the name of treatment, or to a guarantee against the infliction of bodily discomfort. Choices about death touch the core of liberty. Our duty, and the concomitant freedom, to come to terms with the conditions of our own mortality are undoubtedly "so rooted in the traditions and conscience of our people as to be ranked as fundamental," *Snyder* v. *Massachusetts*, 291 U. S. 97, 105 (1934), and indeed are essential incidents of the unalienable rights to life and liberty endowed us by our Creator. See *Meachum* v. *Fano*, 427 U. S. 215, 230 (1976) (STEVENS, J., dissenting).

The more precise constitutional significance of death is difficult to describe; not much may be said with confidence about death unless it is said from faith, and that alone is reason enough to protect the freedom to conform choices about death to individual conscience. We may also, however, justly assume that death is not life's simple opposite, or its necessary terminus,[15] but rather its completion. Our ethical tradition has long regarded an appreciation of mortality as essential to understanding life's significance. It may, in fact, be impossible to live for anything without being prepared to die for something. Certainly there was no disdain for life in Nathan Hale's most famous declaration or in Patrick Henry's;

---

[15] Many philosophies and religions have, for example, long venerated the idea that there is a "life after death," and that the human soul endures even after the human body has perished. Surely Missouri would not wish to define its interest in life in a way antithetical to this tradition.

their words instead bespeak a passion for life that forever preserves their own lives in the memories of their countrymen.[16] From such "honored dead we take increased devotion to that cause for which they gave the last full measure of devotion."[17]

These considerations cast into stark relief the injustice, and unconstitutionality, of Missouri's treatment of Nancy Beth Cruzan. Nancy Cruzan's death, when it comes, cannot be an historic act of heroism; it will inevitably be the consequence of her tragic accident. But Nancy Cruzan's interest in life, no less than that of any other person, includes an interest in how she will be thought of after her death by those whose opinions mattered to her. There can be no doubt that her life made her dear to her family and to others. How she dies will affect how that life is remembered. The trial court's order authorizing Nancy's parents to cease their daughter's treatment would have permitted the family that cares for Nancy to bring to a close her tragedy and her death. Missouri's objection to that order subordinates Nancy's body, her family, and the lasting significance of her life to the State's own interests. The decision we review thereby interferes with constitutional interests of the highest order.

To be constitutionally permissible, Missouri's intrusion upon these fundamental liberties must, at a minimum, bear a reasonable relationship to a legitimate state end. See, e. g., Meyer v. Nebraska, 262 U. S., at 400; Doe v. Bolton, 410 U. S. 179, 194–195, 199 (1973). Missouri asserts that its policy is related to a state interest in the protection of life. In my view, however, it is an effort to define life, rather than to protect it, that is the heart of Missouri's policy. Missouri insists, without regard to Nancy Cruzan's own interests, upon

---

[16] See, e. g., H. Johnston, Nathan Hale 1776: Biography and Memorials 128–129 (1914); J. Axelrad, Patrick Henry: The Voice of Freedom 110–111 (1947).

[17] A. Lincoln, Gettysburg Address, 1 Documents of American History 429 (H. Commager ed.) (9th ed. 1973).

equating her life with the biological persistence of her bodily functions. Nancy Cruzan, it must be remembered, is not now simply incompetent. She is in a persistent vegetative state and has been so for seven years. The trial court found, and no party contested, that Nancy has no possibility of recovery and no consciousness.

It seems to me that the Court errs insofar as it characterizes this case as involving "judgments about the 'quality' of life that a particular individual may enjoy," *ante*, at 282. Nancy Cruzan is obviously *"alive"* in a physiological sense. But for patients like Nancy Cruzan, who have no consciousness and no chance of recovery, there is a serious question as to whether the mere persistence of their bodies is *"life"* as that word is commonly understood, or as it is used in both the Constitution and the Declaration of Independence.[18] The State's unflagging determination to perpetuate Nancy Cruzan's physical existence is comprehensible only as an effort to define life's meaning, not as an attempt to preserve its sanctity.

This much should be clear from the oddity of Missouri's definition alone. Life, particularly human life, is not commonly thought of as a merely physiological condition or func-

---

[18] The Supreme Judicial Court of Massachusetts observed in this connection: "When we balance the State's interest in prolonging a patient's life against the rights of the patient to reject such prolongation, we must recognize that the State's interest in life encompasses a broader interest than mere corporeal existence. In certain, thankfully rare, circumstances the burden of maintaining the corporeal existence degrades the very humanity it was meant to serve." *Brophy* v. *New England Sinai Hospital, Inc.*, 398 Mass. 417, 433–434, 497 N. E. 2d 626, 635 (1986). The *Brophy* court then stressed that this reflection upon the nature of the State's interest in life was distinguishable from any considerations related to the quality of a particular patient's life, considerations which the court regarded as irrelevant to its inquiry. See also *In re Eichner*, 73 App. Div. 2d 431, 465, 426 N. Y. S. 2d 517, 543 (1980) (A patient in a persistent vegetative state "has *no* health, and, in the true sense, no life, for the State to protect"), modified in *In re Storar*, 52 N. Y. 2d 363, 420 N. E. 2d 64 (1981).

tion.[19]   Its sanctity is often thought to derive from the impossibility of any such reduction.   When people speak of life, they often mean to describe the experiences that comprise a person's history, as when it is said that somebody "led a good life."[20]   They may also mean to refer to the practical manifestation of the human spirit, a meaning captured by the familiar observation that somebody "added life" to an assembly.   If there is a shared thread among the various opinions on this subject, it may be that life is an activity which is at once the matrix for, and an integration of, a person's interests.   In

---

[19] One learned observer suggests, in the course of discussing persistent vegetative states, that "few of us would accept the preservation of such a reduced level of function as a proper *goal* for medicine, even though we sadly accept it as an unfortunate and unforeseen *result* of treatment that had higher aspirations, and even if we refuse actively to cause such vegetative life to cease."   L. Kass, Toward a More Natural Science 203 (1985). This assessment may be controversial.   Nevertheless, I again tend to agree with Judge Blackmar, who in his dissent from the Missouri Supreme Court's decision contended that it would be unreasonable for the State to assume that most people *did* in fact hold a view contrary to the one described by Dr. Kass.

My view is further buttressed by the comments of the President's Commission for the Study of Ethical Problems in Medicine and Biomedical and Behavioral Research:

"The primary basis for medical treatment of patients is the prospect that each individual's interests (specifically, the interest in well-being) will be promoted.   Thus, treatment ordinarily aims to benefit a patient through preserving life, relieving pain and suffering, protecting against disability, and returning maximally effective functioning.   If a prognosis of permanent unconsciousness is correct, however, continued treatment cannot confer such benefits.   Pain and suffering are absent, as are joy, satisfaction, and pleasure.   Disability is total and no return to an even minimal level of social or human functioning is possible."   Deciding to Forego Life-Sustaining Treatment 181–182 (1983).

[20] It is this sense of the word that explains its use to describe a biography: for example, Boswell's Life of Johnson or Beveridge's The Life of John Marshall.   The reader of a book so titled would be surprised to find that it contained a compilation of biological data.

any event, absent some theological abstraction, the idea of life is not conceived separately from the idea of a living person. Yet, it is by precisely such a separation that Missouri asserts an interest in Nancy Cruzan's life in opposition to Nancy Cruzan's own interests. The resulting definition is uncommon indeed.

The laws punishing homicide, upon which the Court relies, *ante*, at 280, do not support a contrary inference. Obviously, such laws protect both the life *and* interests of those who would otherwise be victims. Even laws against suicide presuppose that those inclined to take their own lives have *some* interest in living, and, indeed, that the depressed people whose lives are preserved may later be thankful for the State's intervention. Likewise, decisions that address the "quality of life" of incompetent, but conscious, patients rest upon the recognition that these patients have *some* interest in continuing their lives, even if that interest pales in some eyes when measured against interests in dignity or comfort. Not so here. Contrary to the Court's suggestion, Missouri's protection of life in a form abstracted from the living is not commonplace; it is aberrant.

Nor does Missouri's treatment of Nancy Cruzan find precedent in the various state-law cases surveyed by the majority. Despite the Court's assertion that state courts have demonstrated "both similarity and diversity in their approaches" to the issue before us, *none* of the decisions surveyed by the Court interposed an absolute bar to the termination of treatment for a patient in a persistent vegetative state. For example, *In re Westchester County Medical Center on behalf of O'Connor*, 72 N. Y. 2d 517, 531 N. E. 2d 607 (1988), pertained to an incompetent patient who "was not in a coma or vegetative state. She was conscious, and capable of responding to simple questions or requests sometimes by squeezing the questioner's hand and sometimes verbally."

*Id.*, at 524–525, 531 N. E. 2d, at 609–610.   Likewise, *In re Storar*, 52 N. Y. 2d 363, 420 N. E. 2d 64 (1981), involved a conscious patient who was incompetent because "profoundly retarded with a mental age of about 18 months."   *Id.*, at 373, 420 N. E. 2d, at 68.   When it decided *In re Conroy*, 98 N. J. 321, 486 A. 2d 1209 (1985), the New Jersey Supreme Court noted that "Ms. Conroy was not brain dead, comatose, or in a chronic vegetative state," 98 N. J., at 337, 486 A. 2d, at 1217, and then distinguished *In re Quinlan*, 70 N. J. 10, 355 A. 2d 647 (1976), on the ground that Karen Quinlan had been in a "persistent vegetative or comatose state."   98 N. J., at 358–359, 486 A. 2d, at 1228.   By contrast, an unbroken stream of cases has authorized procedures for the cessation of treatment of patients in persistent vegetative states.[21]   Con-

---

[21] See, *e. g.*, *In re Estate of Longeway*, 133 Ill. 2d 33, 549 N. E. 2d 292 (1989) (authorizing removal of a gastrostomy tube from a permanently unconscious patient after judicial approval is obtained); *McConnell* v. *Beverly Enterprises-Connecticut, Inc.*, 209 Conn. 692, 705, 553 A. 2d 596, 603 (1989) (authorizing, pursuant to statute, removal of a gastrostomy tube from patient in a persistent vegetative state, where patient had previously expressed a wish not to have treatment sustained); *Gray* v. *Romeo*, 697 F. Supp. 580 (RI 1988) (authorizing removal of a feeding tube from a patient in a persistent vegetative state); *Rasmussen* v. *Fleming*, 154 Ariz. 207, 741 P. 2d 674 (1987) (en banc) (authorizing procedures for the removal of a feeding tube from a patient in a persistent vegetative state); *In re Gardner*, 534 A. 2d 947 (Me. 1987) (allowing discontinuation of life-sustaining procedures for a patient in a persistent vegetative state); *In re Peter*, 108 N. J. 365, 529 A. 2d 419 (1987) (authorizing procedures for cessation of treatment to elderly nursing home patient in a persistent vegetative state); *In re Jobes*, 108 N. J. 394, 529 A. 2d 434 (1987) (authorizing procedures for cessation of treatment to nonelderly patient determined by "clear and convincing" evidence to be in a persistent vegetative state); *Brophy* v. *New England Sinai Hospital, Inc.*, 398 Mass. 417, 497 N. E. 2d 626 (1986) (permitting removal of a feeding tube from a patient in a persistent vegetative state); *John F. Kennedy Memorial Hospital, Inc.* v. *Bludworth*, 452 So. 2d 921 (Fla. 1984) (holding that court approval was not needed to authorize cessation of life-support for patient in a persistent vegetative state who had executed a living will); *In re Conservatorship of Torres*, 357 N. W. 2d 332 (Minn. 1984) (authorizing removal of a permanently unconscious patient from life-support systems); *In re L. H. R.*, 253 Ga. 439, 321 S. E. 2d

sidered against the background of other cases involving patients in persistent vegetative states, instead of against the broader—and inapt—category of cases involving chronically ill incompetent patients, Missouri's decision is anomolous.

716 (1984) (allowing parents to terminate life support for infant in a chronic vegetative state); *In re Hamlin*, 102 Wash. 2d 810, 689 P. 2d 1372 (1984) (allowing termination, without judicial intervention, of life support for patient in a vegetative state if doctors and guardian concur; conflicts among doctors and the guardian with respect to cessation of treatment are to be resolved by a trial court); *In re Colyer*, 99 Wash. 2d 114, 660 P. 2d 738 (1983), modified on other grounds, *In re Hamlin*, 102 Wash. 2d 810, 689 P. 2d 1372 (1984) (allowing court-appointed guardian to authorize cessation of treatment of patient in persistent vegetative state); *In re Eichner* (decided with *In re Storar*), 52 N. Y. 2d 363, 420 N. E. 2d 64 (authorizing the removal of a patient in a persistent vegetative state from a respirator), cert. denied, 454 U. S. 858 (1981); *In re Quinlan*, 70 N. J. 10, 355 A. 2d 647 (authorizing, on constitutional grounds, the removal of a patient in a persistent vegetative state from a respirator), cert. denied, 429 U. S. 922 (1976); *Corbett* v. *D'Alessandro*, 487 So. 2d 368 (Fla. App. 1986) (authorizing removal of nasogastric feeding tube from patient in persistent vegetative state); *In re Conservatorship of Drabick*, 200 Cal. App. 3d 185, 218, 245 Cal. Rptr. 840, 861 (1988) ("Life sustaining treatment is not 'necessary' under Probate Code section 2355 if it offers no reasonable possibility of returning the conservatee to cognitive life and if it is not otherwise in the conservatee's best interests, as determined by the conservator in good faith") (footnote omitted); *Delio* v. *Westchester County Medical Center*, 129 App. Div. 2d 1, 516 N. Y. S. 2d 677 (1987) (authorizing discontinuation of artificial feeding for a 33-year-old patient in a persistent vegetative state); *Leach* v. *Akron General Medical Center*, 68 Ohio Misc. 1, 426 N. E. 2d 809 (1980) (authorizing removal of a patient in a persistent vegetative state from a respirator); *In re Severns*, 425 A. 2d 156 (Del. Ch. 1980) (authorizing discontinuation of all medical support measures for a patient in a "virtual vegetative state").

These cases are not the only ones which have allowed the cessation of life-sustaining treatment to incompetent patients. See, *e. g.*, *Superintendant of Belchertown State School* v. *Saikewicz*, 373 Mass. 728, 370 N. E. 2d 417 (1977) (holding that treatment could have been withheld from a profoundly mentally retarded patient); *Bouvia* v. *Superior Court of Los Angeles County*, 179 Cal. App. 3d 1127, 225 Cal. Rptr. 297 (1986) (allowing removal of lifesaving nasogastric tube from competent, highly intelligent patient who was in extreme pain).

In short, there is no reasonable ground for believing that Nancy Beth Cruzan has any *personal* interest in the perpetuation of what the State has decided is her life. As I have already suggested, it would be possible to hypothesize such an interest on the basis of theological or philosophical conjecture. But even to posit such a basis for the State's action is to condemn it. It is not within the province of secular government to circumscribe the liberties of the people by regulations designed wholly for the purpose of establishing a sectarian definition of life. See *Webster* v. *Reproductive Health Services*, 492 U. S. 490, 566–572 (1989) (STEVENS, J., dissenting).

My disagreement with the Court is thus unrelated to its endorsement of the clear and convincing standard of proof for cases of this kind. Indeed, I agree that the controlling facts must be established with unmistakable clarity. The critical question, however, is not how to prove the controlling facts but rather what proven facts should be controlling. In my view, the constitutional answer is clear: The best interests of the individual, especially when buttressed by the interests of all related third parties, must prevail over any general state policy that simply ignores those interests.[22] Indeed, the only apparent *secular* basis for the State's interest in life is the policy's persuasive impact upon people other than Nancy and her family. Yet, "[a]lthough the State may properly perform a teaching function," and although that teaching may foster respect for the sanctity of life, the State may not pursue its project by infringing constitutionally protected inter-

---

[22] Although my reasoning entails the conclusion that the best interests of the incompetent patient must be respected even when the patient is conscious, rather than in a vegetative state, considerations pertaining to the "quality of life," in addition to considerations about the definition of life, might then be relevant. The State's interest in protecting the life, and thereby the interests, of the incompetent patient would accordingly be more forceful, and the constitutional questions would be correspondingly complicated.

ests for *"symbolic* effect." *Carey* v. *Population Services International*, 431 U. S. 678, 715 (1977) (STEVENS, J., concurring in part and concurring in judgment). The failure of Missouri's policy to heed the interests of a dying individual with respect to matters so private is ample evidence of the policy's illegitimacy.

Only because Missouri has arrogated to itself the power to define life, and only because the Court permits this usurpation, are Nancy Cruzan's life and liberty put into disquieting conflict. If Nancy Cruzan's life were defined by reference to her own interests, so that her life expired when her biological existence ceased serving *any* of her own interests, then her constitutionally protected interest in freedom from unwanted treatment would not come into conflict with her constitutionally protected interest in life. Conversely, if there were *any* evidence that Nancy Cruzan herself defined life to encompass every form of biological persistence by a human being, so that the continuation of treatment would serve Nancy's own liberty, then once again there would be no conflict between life and liberty. The opposition of life and liberty in this case are thus not the result of Nancy Cruzan's tragic accident, but are instead the artificial consequence of Missouri's effort, and this Court's willingness, to abstract Nancy Cruzan's life from Nancy Cruzan's person.

## IV

Both this Court's majority and the state court's majority express great deference to the policy choice made by the state legislature.[23] That deference is, in my view, based

---

[23] Thus, the state court wrote:

"This State has expressed a strong policy favoring life. We believe that policy dictates that we err on the side of preserving life. If there is to be a change in that policy, it must come from the people through their elected representatives. Broad policy questions bearing on life and death issues are more properly addressed by representative assemblies. These have vast fact and opinion gathering and synthesizing powers unavailable to

upon a severe error in the Court's constitutional logic. The Court believes that the liberty interest claimed here on behalf of Nancy Cruzan is peculiarly problematic because "[a]n incompetent person is not able to make an informed and voluntary choice to exercise a hypothetical right to refuse treatment or any other right." *Ante*, at 280. The impossibility of such an exercise affords the State, according to the Court, some discretion to interpose "a procedural requirement" that effectively compels the continuation of Nancy Cruzan's treatment.

There is, however, nothing "hypothetical" about Nancy Cruzan's constitutionally protected interest in freedom from unwanted treatment, and the difficulties involved in ascertaining what her interests are do not in any way justify the State's decision to oppose her interests with its own. As this case comes to us, the crucial question—and the question addressed by the Court—is not what Nancy Cruzan's interests are, but whether the State must give effect to them. There is certainly nothing novel about the practice of permitting a next friend to assert constitutional rights on behalf of an incompetent patient who is unable to do so. See, *e. g.*, *Youngberg* v. *Romeo*, 457 U. S. 307, 310 (1982); *Whitmore* v. *Arkansas*, 495 U. S. 149, 161–164 (1990). Thus, if Nancy Cruzan's incapacity to "exercise" her rights is to alter the balance between her interests and the State's, there must be some further explanation of how it does so. The Court offers two possibilities, neither of them satisfactory.

The first possibility is that the State's policy favoring life is by its nature less intrusive upon the patient's interest than any alternative. The Court suggests that Missouri's policy "results in a maintenance of the status quo," and is subject to reversal, while a decision to terminate treatment "is not sus-

courts; the exercise of these powers is particularly appropriate where issues invoke the concerns of medicine, ethics, morality, philosophy, theology and law. Assuming change is appropriate, this issue demands a comprehensive resolution which courts cannot provide." 760 S. W. 2d, at 426.

ceptible of correction" because death is irreversible. *Ante*, at 283. Yet, this explanation begs the question, for it assumes either that the State's policy is consistent with Nancy Cruzan's own interests, or that no damage is done by ignoring her interests. The first assumption is without basis in the record of this case, and would obviate any need for the State to rely, as it does, upon its own interests rather than upon the patient's. The second assumption is unconscionable. Insofar as Nancy Cruzan has an interest in being remembered for how she lived rather than how she died, the damage done to those memories by the prolongation of her death is irreversible. Insofar as Nancy Cruzan has an interest in the cessation of any pain, the continuation of her pain is irreversible. Insofar as Nancy Cruzan has an interest in a closure to her life consistent with her own beliefs rather than those of the Missouri Legislature, the State's imposition of its contrary view is irreversible. To deny the importance of these consequences is in effect to deny that Nancy Cruzan has interests at all, and thereby to deny her personhood in the name of preserving the sanctity of her life.

The second possibility is that the State must be allowed to define the interests of incompetent patients with respect to life-sustaining treatment because there is no procedure capable of determining what those interests are in any particular case. The Court points out various possible "abuses" and inaccuracies that may affect procedures authorizing the termination of treatment. See *ante*, at 281–282. The Court correctly notes that in some cases there may be a conflict between the interests of an incompetent patient and the interests of members of his or her family. A State's procedures must guard against the risk that the survivors' interests are not mistaken for the patient's. Yet, the appointment of the neutral guardian ad litem, coupled with the searching inquiry conducted by the trial judge and the imposition of the clear and convincing standard of proof, all effectively avoided that risk in this case. Why such procedural safeguards should not

be adequate to avoid a similar risk in other cases is a question the Court simply ignores.

Indeed, to argue that the mere possibility of error in *any* case suffices to allow the State's interests to override the particular interests of incompetent individuals in *every* case, or to argue that the interests of such individuals are unknowable and therefore may be subordinated to the State's concerns, is once again to deny Nancy Cruzan's personhood. The meaning of respect for her personhood, and for that of others who are gravely ill and incapacitated, is, admittedly, not easily defined: Choices about life and death are profound ones, not susceptible of resolution by recourse to medical or legal rules. It may be that the best we can do is to ensure that these choices are made by those who will care enough about the patient to investigate his or her interests with particularity and caution. The Court seems to recognize as much when it cautions against formulating any general or inflexible rule to govern all the cases that might arise in this area of the law. *Ante*, at 277–278. The Court's deference to the legislature is, however, itself an inflexible rule, one that the Court is willing to apply in this case even though the Court's principal grounds for deferring to Missouri's Legislature are hypothetical circumstances not relevant to Nancy Cruzan's interests.

On either explanation, then, the Court's deference seems ultimately to derive from the premise that chronically incompetent persons have no constitutionally cognizable interests at all, and so are not persons within the meaning of the Constitution. Deference of this sort is patently unconstitutional. It is also dangerous in ways that may not be immediately apparent. Today the State of Missouri has announced its intent to spend several hundred thousand dollars in preserving the life of Nancy Beth Cruzan in order to vindicate its general policy favoring the preservation of human life. Tomorrow, another State equally eager to champion an interest in the "quality of life" might favor a policy designed to ensure quick

and comfortable deaths by denying treatment to categories of marginally hopeless cases. If the State in fact has an interest in defining life, and if the State's policy with respect to the termination of life-sustaining treatment commands deference from the judiciary, it is unclear how any resulting conflict between the best interests of the individual and the general policy of the State would be resolved.[24] I believe the Constitution requires that the individual's vital interest in liberty should prevail over the general policy in that case, just as in this.

That a contrary result is readily imaginable under the majority's theory makes manifest that this Court cannot defer to any state policy that drives a theoretical wedge between a person's life, on the one hand, and that person's liberty or happiness, on the other.[25] The consequence of such a theory

---

[24] The Supreme Judicial Court of Massachusetts anticipated this possibility in its *Brophy* decision, where it observed that the "duty of the State to preserve life must encompass a recognition of an individual's right to avoid circumstances in which the individual himself would feel that efforts to sustain life demean or degrade his humanity," because otherwise the State's defense of life would be tantamount to an effort by "the State to make decisions regarding the individual's quality of life." 398 Mass., at 434, 497 N. E. 2d, at 635. Accord, *Gray* v. *Romeo*, 697 F. Supp., at 588.

[25] Judge Campbell said on behalf of the Florida District Court of Appeal for the Second District:

"[W]e want to acknowledge that we began our deliberations in this matter, as did those who drafted our Declaration of Independence, with the solemnity and the gratefulness of the knowledge 'that all men are . . . endowed by their Creator with . . . Life.' It was not without considerable searching of our hearts, souls, and minds, as well as the jurisprudence of this great Land that we have reached our conclusions. We forcefully affirm that Life having been endowed by our Creator should not be lightly taken nor relinquished. We recognize, however, that we are also endowed with a certain amount of dignity and the right to the 'Pursuit of Happiness.' When, therefore, it may be determined by reason of the advanced scientific and medical technologies of this day that Life has, through causes beyond our control, reached the unconscious and vegetative state where all that remains is the forced function of the body's vital functions, including the artificial sustenance of the body itself, then we recognize the right to allow

is to deny the personhood of those whose lives are defined by the State's interests rather than their own. This consequence may be acceptable in theology or in speculative philosophy, see *Meyer*, 262 U. S., at 401–402, but it is radically inconsistent with the foundation of all legitimate government. Our Constitution presupposes a respect for the personhood of every individual, and nowhere is strict adherence to that principle more essential than in the judicial branch. See, *e. g.*, *Thornburgh* v. *American College of Obstetricians and Gynecologists*, 476 U. S., at 781–782 (STEVENS, J., concurring).

## V

In this case, as is no doubt true in many others, the predicament confronted by the healthy members of the Cruzan family merely adds emphasis to the best interests finding made by the trial judge. Each of us has an interest in the kind of memories that will survive after death. To that end, individual decisions are often motivated by their impact on others. A member of the kind of family identified in the trial court's findings in this case would likely have not only a normal interest in minimizing the burden that her own illness imposes on others, but also an interest in having their memories of her filled predominantly with thoughts about her past vitality rather than her current condition. The meaning and completion of her life should be controlled by persons who have her best interests at heart—not by a state legislature concerned only with the "preservation of human life."

The Cruzan family's continuing concern provides a concrete reminder that Nancy Cruzan's interests did not disappear with her vitality or her consciousness. However commendable may be the State's interest in human life, it cannot pursue that interest by appropriating Nancy Cruzan's life as a symbol for its own purposes. Lives do not exist in abstrac-

---

the natural consequence of the removal of those artificial life sustaining measures." *Corbett* v. *D'Alessandro*, 487 So. 2d, at 371.

tion from persons, and to pretend otherwise is not to honor but to desecrate the State's responsiblity for protecting life. A State that seeks to demonstrate its commitment to life may do so by aiding those who are actively struggling for life and health. In this endeavor, unfortunately, no State can lack for opportunities: There can be no need to make an example of tragic cases like that of Nancy Cruzan.

I respectfully dissent.